TATE & LYLE, INC. AND SUBSIDIARIES, PETITIONER
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 740–92.          Filed November 15, 1994.

*Dan M. Burt, Henry B. Miller, David G. Tripp,* and *James R. Hagerty,* for petitioner.

*Darrell C. Weaver,* for respondent.

OPINION

RUWE, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax as follows:

| | | Additions to tax | | |
| --- | --- | --- | --- | --- |
| *FYE* | *Deficiency* | *Sec. 6653(a)(1)* | *Sec. 6653(a)(2)* | *Sec. 6661(a)* |
| 9/29/85 | $1,244,862 | $62,243 | 50 percent of the interest due on $1,244,862 | $311,215 |

| | | Additions to tax | | |
| --- | --- | --- | --- | --- |
| *FYE* | *Deficiency* | *Sec. 6653(a)(1)(A)* | *Sec. 6653(a)(1)(B)* | *Sec. 6661(a)* |
| 9/28/86 | $3,437,849 | $171,892 | 50 percent of the interest due on $3,437,849 | $859,462 |
| 9/26/87 | 5,130,100 | 256,505 | 50 percent of the interest due on $5,130,100 | 1,282,525 |

The sole issue for decision is whether petitioner may deduct interest owed to its foreign parent in the tax year in which it was accrued, or whether section 267[1] requires that the deduction be deferred until the interest is actually paid.[2]

The parties submitted this case fully stipulated. The stipulation of facts and attached exhibits, first supplemental stipulation of facts, settlement stipulation, and first supplemental settlement stipulation are incorporated herein by this reference.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] All other issues raised in the pleadings have been settled.

## Background

Petitioner is an affiliated group of corporations that timely filed consolidated U.S. Corporation Income Tax Returns for the periods at issue. Tate & Lyle, Inc. (TLI), is the common parent of the affiliated group. TLI is incorporated in, and has its principal office in, Delaware. Refined Sugars, Inc. (RSI), is one of the members of petitioner's affiliated group.

During the periods at issue, Tate & Lyle plc (PLC) was a publicly traded United Kingdom corporation and was the parent corporation of the worldwide group of Tate & Lyle companies. PLC indirectly owned 100 percent of TLI and RSI. PLC, TLI, and RSI were members of the same controlled group of corporations as defined in section 267(f).

TLI and RSI were U.S. residents, and PLC was a U.K. resident, as defined in the Convention for the Avoidance of Double Taxation, Dec. 31, 1975, U.S.-U.K., 31 U.S.T. 5668 (treaty). PLC, TLI, and RSI were entitled to all the benefits of the treaty. At no time during the periods at issue did PLC maintain a permanent establishment or engage in a trade or business in the United States.

PLC made interest-bearing loans to TLI and RSI. RSI borrowed $21 million on April 4, 1985, from PLC for the purpose of acquiring the assets of Great Western Sugar Co. TLI borrowed $27 million on September 30, 1985, from PLC for the purpose of acquiring Vigortone Pacific Molasses Co. Additionally, PLC made short-term loans to TLI and RSI. The interest PLC received from TLI and RSI was U.S.-source income that was not effectively connected with PLC's conduct of a trade or business in the United States. The interest PLC received was exempt from taxation in the United States under Article 11(1) of the treaty, 31 U.S.T. at 5680.

For financial reporting purposes, PLC accrued the interest receivable from TLI and RSI. As required under the income tax laws of the United Kingdom during the periods at issue, PLC reported interest income from TLI and RSI when it was actually received. In 1993, the income tax laws of the United Kingdom were changed, providing that interest income received from foreign sources is subject to tax when the interest accrues rather than when it is received.

In accordance with their methods of accounting, TLI and RSI accrued the interest due on the loans from PLC and

charged the accrued interest to an account called "Accrued Interest Payable". In the taxable periods corresponding to the periods that TLI and RSI accrued the interest, petitioner deducted the accrued interest on its consolidated tax returns. TLI and RSI paid interest to PLC during the tax period following the accrual.[3]

Respondent disallowed the accrued interest expense deductions petitioner claimed on its consolidated returns on the grounds that the interest should have been deducted in the period in which it was actually paid, not in the period in which it was accrued. In the notice of deficiency, respondent computed the adjustment to petitioner's taxable income as follows:

|  | 9/30/84 | 9/29/85 | 9/28/86 | 9/26/87 |
|---|---|---|---|---|
| Interest accrued | $185,152 | $204,397 | $601,883 | $681,459 |
| Interest paid |  | (185,152) | (204,397) | (601,883) |
| Notice of deficiency adjustment |  | 19,245 | 397,486 | 79,576 |

## Discussion

Section 267 generally requires taxpayers to defer deductions for amounts payable to a related person until the amount is includable in the recipient's gross income.[4] The purpose underlying section 267 is to prevent the use of differing methods of reporting income for Federal tax purposes in order to obtain artificial deductions.

It was recognized that there were instances where an individual on the accrual method became indebted to a creditor with whom he enjoyed a special relationship, such as a member of his family, or to a corporation he controlled, and his creditor reported income on the cash method. There-

---

[3] TLI and RSI accrued and paid interest in the following periods:

| | TLI | | RSI | |
| Period ended | Accrued | Paid | Accrued | Paid |
|---|---|---|---|---|
| 9/30/84 | $185,152 | - 0 - | - 0 - | - 0 - |
| 9/29/85 | 151,397 | $185,152 | $53,000 | - 0 - |
| 9/28/86 | 582,883 | 151,397 | 19,000 | $53,000 |
| 9/26/87 | 578,459 | 582,883 | 103,000 | 19,000 |
| 9/24/88 | - 0 - | 578,459 | - 0 - | - 0 - |
| 9/25/88 | - 0 - | - 0 - | - 0 - | 103,000 |

Petitioner's tax period that ended Sept. 30, 1984, is not in issue in this case.

[4] Their is no question that TLI, RSI, and PLC are related persons within the meaning of sec. 267(b).

after, as interest became due on the debt, the debtor on the accrual method reported the interest as a deduction for income tax purposes, but he did not make any actual payment to his creditor. Since the creditor was on the cash method, he reported no income. The debtor would consequently gain the benefit of a current deduction, whereas the related creditor would defer income recognition until the year of receipt of actual payment. Sometimes the sum involved would escape income taxation altogether because the payment was timed to a year when the creditor had offsetting losses. [*Metzger Trust v. Commissioner,* 76 T.C. 42, 75–76 (1981), affd. 693 F.2d 459 (5th Cir. 1982); fn. ref. omitted.]

The specific matching provisions of section 267 are in subsection (a)(2), which provides:

(2) MATCHING OF DEDUCTION AND PAYEE INCOME ITEM IN THE CASE OF EXPENSES AND INTEREST.—If—

(A) *by reason of the method of accounting of the person to whom the payment is to be made,* the amount thereof is not (unless paid) includible in the gross income of such person, and

(B) at the close of the taxable year of the taxpayer for which (but for this paragraph) the amount would be deductible under this chapter, both the taxpayer and the person to whom the payment is to be made are persons specified in any of the paragraphs of subsection (b),

then any deduction allowable under this chapter in respect of such amount shall be allowable as of the day as of which such amount is includible in the gross income of the person to whom the payment is made * * *

[Emphasis added.]

The operation of section 267(a)(2) is not restricted to domestic payors and payees. However, Congress believed that when foreign payees were involved, the application of section 267(a)(2) was unclear in certain circumstances. Thus, in 1986, 2 years after it had enacted the controlling version of section 267(a)(2), Congress enacted section 267(a)(3), which provides:

(3) PAYMENTS TO FOREIGN PERSONS. The Secretary shall by regulations apply the matching principle of paragraph (2) in cases in which the person to whom the payment is to be made is not a United States person.

Pursuant to section 267(a)(3), regulations were issued on December 31, 1992. The portion of the regulations applicable to the facts presented in this case is contained in section 1.267(a)–3, Income Tax Regs. Section 1.267(a)–3(b)(1), Income Tax Regs., provides:

Except as provided in paragraph (c) of this section, section 267(a)(3) requires a taxpayer to use the cash method of accounting with respect to the deduction of amounts owed to a related foreign person. * * *

Section 1.267(a)–3(c)(2), Income Tax Regs., then provides:

Interest that is not effectively connected income of the related foreign person is an amount covered by paragraph (b) of this section, regardless of whether the related foreign person is exempt from United States taxation on the amount owed pursuant to a treaty obligation of the United States.

Pursuant to the terms of the above-quoted portion of the regulations, petitioner would be required to use the cash method of accounting with respect to the deduction of the interest in issue.

On brief, respondent asserts that

I.R.C. §267(a)(3) only clarified existing tax law. Even without I.R.C. §267(a)(3), under I.R.C. §267(a)(2), petitioner's interest can only be deducted when paid.

* * * * * * *

Here, I.R.C. §267(a)(3), was enacted to clarify I.R.C. §267(a)(2), which had been effective since 1984. Tax Reform Act of 1984, Pub. L. No. 98–369, sec. 174(a)(1). Because I.R.C. §267(a)(3) is a technical correction or clarification of the earlier law, it, too, was made effective by Congress for tax years beginning after December 31, 1983. Pub. L. No. 99–514, §§1812(c)(1), 1881.

We will first determine whether the matching principle of section 267(a)(2) requires the result sought by respondent.[5]

The matching principle of section 267(a)(2) is that an accrual basis taxpayer is not entitled to deduct an accrued item if the accrued item is payable to a related person, and the item is not currently includable in the payee's gross income because of the payee's method of accounting. See Notice 89–84, 1989–2 C.B. 402. When this principle applies, deductions must be deferred until the expense item is includable in the gross income of the person to whom the payment is to be made.

-----

[5] Petitioner argues that the regulations do not support respondent's determination in this case because they were not in existence when respondent made the deficiency determination, and therefore respondent had no legal basis for the deficiency determination. The notices of deficiency were dated Oct. 11, 1991. Petitioner filed its petition on Jan. 9, 1992. Sec. 1.267(a)–3, Income Tax Regs., was issued on Dec. 31, 1992. If the regulations apply only the preexisting matching principle of sec. 267(a)(2), petitioner's argument that respondent had no legal basis for the deficiency determination must fail. Of course, the corollary to this is that regulations promulgated under sec. 267(a)(3) cannot properly require the deferral of deductions in situations that are outside the purview of sec. 267(a)(2) and beyond the scope of its matching principle.

Respondent argues that, for Federal tax purposes, the appropriate method of accounting for the interest payable to PLC is the cash method. Respondent bases this on the fact that a foreign corporation's interest income, which is from sources within the United States, but is not effectively connected with a trade or business in the United States, is generally subject to U.S. tax under sections 881(a)(1) and 1442(a) when the interest is actually received by the foreign payee.[6]

We agree that, to the extent sections 881(a)(1) and 1442(a) determine *when* a foreign payee must include interest in gross income for Federal tax purposes, the timing provisions of those sections constitute the method of accounting for such interest income under section 267. The problem with applying the method of accounting inherent in sections 881(a) and 1442(a) to the facts of the instant case is that the interest payable to PLC is not subject to tax under those provisions. This is because the interest was not includable in PLC's gross income pursuant to the U.S.-U.K. Income Tax Treaty, the Code, and the regulations.

Income exempted from U.S. taxation under an income tax treaty is not included in gross income for purposes of sections 881 and 1442. Section 882(b) defines gross income of a foreign corporation as follows:

SEC. 882(b). GROSS INCOME.—In the case of a foreign corporation, gross income includes only—

(1) gross income which is derived from sources within the United States and which is not effectively connected with the conduct of a trade or business within the United States, and

(2) gross income which is effectively connected with the conduct of a trade or business within the United States.

Absent a treaty provision requiring otherwise, the interest items in issue would be gross income under section 882(b)(1). This type of income is taxed pursuant to section 881. The regulations under section 882 thus provide:

---

[6] Sec. 881(a)(1) imposes "for each taxable year a tax of 30 percent of the *amount received* from sources within the United States by a foreign corporation as" interest. (Emphasis added.) Sec. 1442(a) provides that in the case of foreign corporations subject to this 30 percent tax, "there shall be deducted and withheld at the source in the same manner and on the same items of income as provided in section 1441 a tax equal to 30 percent thereof." Sec. 1.1441–1, Income Tax Regs., provides that withholding of the 30 percent tax is required *"when such income is paid* to a * * * foreign corporation". (Emphasis added.)

(b) *Imposition of Tax.*—(1) *Income not effectively connected with the conduct of a trade or business in the United States.* If a foreign corporation to which this section applies derives during the taxable year from sources within the United States *income or gains described in section 881(a) and paragraph (b) or (c) of §1.881–2* which are not effectively connected for the taxable year with the conduct of a trade or business in the United States by that corporation, such income or gains shall be subject to a flat tax of 30 percent of the aggregate amount of such items. *This tax shall be determined in the manner, and subject to the same conditions, set forth in §1.881–2* as though the income or gains were derived by a foreign corporation not engaged in trade or business in the United States during the taxable year * * * [Sec. 1.882–1(b), Income Tax Regs.; emphasis added.]

## Section 1.881–2(a)(1) and (2), Income Tax Regs., provides:

(a) *Imposition of tax.* (1) * * * *Except as otherwise provided in §1.871–12,* a foreign corporation to which this section applies is not subject to the tax imposed by section 11 or section 1201(a) but, pursuant to the provisions of section 881(a), is liable to a flat tax of 30 percent upon the aggregate of the amounts determined under paragraphs (b) and (c) of this section which are received during the taxable year from sources within the United States. * * *

(2) The tax of 30 percent is imposed by section 881(a) upon an amount *only to the extent the amount constitutes gross income.*

[Emphasis added.]

Therefore, a flat tax of 30 percent generally applies, unless "otherwise provided in §1.871–12" and "only to the extent the amount constitutes gross income." Sec. 1.881–2(a)(1) and (2), Income Tax Regs.

Section 1.871–12, Income Tax Regs., is titled "Determination of tax on treaty income." This section provides:

(a) *In general.* This section applies for purposes of determining under §1.871–7 or §1.871–8 the tax of a nonresident alien individual, or under §1.881–2 or §1.882–1 the tax of a foreign corporation, which for the taxable year has income described in section 872(a) or 882(b) upon which the tax is limited by an income tax convention to which the United States is a party. *Income for such purposes does not include income of any kind which is exempt from tax under the provisions of an income tax convention to which the United States is a party.* See §§1.872–2(c) and 1.883–1(b). * * *

(b) *Definition of treaty and nontreaty income.* (1) *In general.* (i) For purposes of this section the term "treaty income" shall be construed to mean the gross income of a nonresident alien individual or foreign corporation, as the case may be, the tax on which is limited by a tax convention. The term "nontreaty income" shall be construed, for such purposes, to mean the gross income of the nonresident alien individual or foreign corporation other than the treaty income. *Neither term includes income of any kind*

which is exempt from the tax imposed by chapter 1 of the Code. * * *
[Sec. 1.871–12, Income Tax Regs.; emphasis added.[7]]

Section 894 is titled "Income Affected by Treaty". The regulations under section 894 provide:

(a) *Income exempt under treaty. Income of any kind is not included in gross income and is exempt from tax under subtitle A (relating to income taxes), to the extent required by any income tax convention to which the United States is a party.* * * * See §1.871–12 for the manner of determining the tax liability of a nonresident alien individual or foreign corporation whose gross income includes income on which the tax is reduced under a tax convention. [Sec. 1.894–1(a), Income Tax Regs.; emphasis added.[8]]

Section 883, titled "Exclusions From Gross Income", provides that certain items shall not be included in gross income. While section 883 contains no specific reference to items exempted pursuant to an income tax treaty, the regulations under section 883 provide:

---

[7] Treaty income, i.e., income on which the tax is "limited" by a tax convention (as opposed to items which are totally exempted from tax), and nontreaty income are fully includable in a foreign recipient's gross income pursuant to sec. 1.871–12, Income Tax Regs.

(3) *Tax on treaty income.* For purposes of subparagraph (1) of this paragraph, compute a tax upon the gross amount, determined without the allowance of any deduction, of each separate item of treaty income at the reduced rate applicable to that item under the tax convention. No credits shall be allowed against the tax determined under this subparagraph.

(d) *Illustrations.* The application of this section may be illustrated by the following examples:
*Example (1).* (a) A nonresident alien individual who is a resident of a foreign country with which the United States has entered into a tax convention receives during the taxable year 1967 from sources within the United States total gross income of $4,100, consisting of the following items and determined without regard to the $100 exclusion granted by section 116(a):

| | |
|---|---|
| Dividends the tax on which is limited by the tax convention to a rate not to exceed 15 percent . . . . . . . . . . . . | $3,100 |
| Compensation for personal services, the tax on which is not limited by the tax convention . . . . . . . . . . . . | 1,000 |
| Total gross income . . . . . . . . . . . . . . . . . . . . . | $4,100 |

[Sec. 1.871–12, Income Tax Regs.]
[8] Before the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100–647, 102 Stat. 3342, sec. 894 provided:

Income of any kind, to the extent required by any treaty obligation of the United States, shall not be included in gross income and shall be exempt from taxation under this subtitle.

Sec. 894 was amended by the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100–647, sec. 1012(aa)(6), 102 Stat. 3533. The purpose of this amendment was to clarify the interaction between statutes and treaties. See H. Rept. 100–795, at 300 (1988); S. Rept. 100–445, at 316 (1988). The 1988 amendment had no impact on the exclusion from gross income of items exempt from tax by treaty. Thus, the regulations excluding such items from gross income were not changed, and respondent continued to advise taxpayers that such items were not includable in gross income. See Withholding of Tax on Nonresident Aliens and Foreign Corporations, IRS Pub. 515, at 26 (1993 rev.) ("Income that is exempt from U.S. income taxes under these treaties is not included in gross income of the nonresident alien for U.S. income tax purposes.").

(b) *Income tax conventions. Generally, income of any kind which is exempt, under the provisions of an income tax convention to which the United States is a party, from any tax imposed by subtitle A (relating to income taxes) is not included in the gross income of a foreign corporation.* * * * [Sec. 1.883–1(b), Income Tax Regs.; emphasis added.]

Finally, the current instructions with respect to withholding of tax on nonresident aliens and foreign corporations contained in respondent's publication on Withholding of Tax on Nonresident Aliens and Foreign Corporations, IRS Pub. 515, at 26 (1993 rev.), state:

Income that is exempt from U.S. income taxes under these treaties is not included in gross income of the nonresident alien for U.S. income tax purposes.[9] * * *

The proper interpretation of the combined terms of the treaty and the Code, as contained in respondent's own regulations, is that an item exempt from U.S. tax pursuant to a treaty is not includable in the recipient's "gross income".[10] See *Amaral v. Commissioner,* 90 T.C. 802, 812 (1988). To the extent an item is not includable in a foreign recipient's gross income, sections 881(a)(1) and 1442(a) simply do not apply. See *Northern Ind. Pub. Serv. Co. v. Commissioner,* 101 T.C. 294, 298 (1993); sec. 1.1441–6, Income Tax Regs.; Withholding of Tax on Nonresident Aliens and Foreign Corporations, *supra.*

Having concluded that the interest in question is not includable in PLC's gross income, we must reject respondent's argument that her position can be justified by attributing the method of accounting inherent in sections 881(a)(1) and 1442(a) to PLC. Neither section 881(a)(1) nor section 1442(a) applies to the interest payable to PLC. Therefore, there is no rational way to say that PLC's method of accounting for the interest in question was that contained in sections 881(a)(1)

---

[9] The parties have stipulated that PLC was entitled to all the benefits of the U.S.-U.K. Income Tax Treaty.

[10] The exclusion of an "item" that is exempt from tax by treaty from gross income under the Code is to be distinguished from situations where the receiving "entity" is itself classified as tax exempt. Thus, there may be some instances where sec. 267(a)(2) applies even though the recipient is classified as tax exempt. Under sec. 267(b)(9) a related person includes a "person and an organization to which section 501 applies". However, income items of an organization exempt from taxation under section 501 constitute gross income. Sec. 6033(a)(1) provides that "every organization exempt from taxation under section 501(a) shall file an annual return, stating specifically the items of gross income." Moreover, a tax is imposed on unrelated business income of certain exempt organizations. See sec. 511. In contrast, items exempt from tax pursuant to a treaty are not includable in gross income.

and 1442(a). Based on the foregoing analysis, we hold that section 267(a)(2) does not require the result espoused by respondent.

We must next determine whether issuance of section 1.267(a)–3, Income Tax Regs., requires us to hold for respondent. To do this, we must determine whether the regulations are a valid exercise of the broad authority granted by section 267(a)(3). Section 267(a)(3) gives the Secretary authority to promulgate regulations applying the matching principle of section 267(a)(2). In determining the validity of section 1.267(a)–3, Income Tax Regs., our role is limited. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982). We ordinarily defer to the regulation if it "'[implements] the congressional mandate in some reasonable manner.'" *Id.* at 24 (quoting *United States v. Correll*, 389 U.S. 299, 307 (1967)). An interpretative regulation is a reasonable implementation of the congressional mandate if it "harmonizes with the plain language of the statute, its origin, and its purpose." *National Muffler Dealers Association v. United States*, 440 U.S. 472, 477 (1979); *Rowan Cos. v. United States*, 452 U.S. 247 (1981). A regulation issued pursuant to a specific grant of authority, a so-called legislative regulation, is entitled to greater weight and deference than an interpretative regulation issued pursuant to the Commissioner's general grant of authority to "prescribe all needful rules and regulations" under section 7805(a).[11] See *United States v. Vogel Fertilizer Co., supra* at 24; *Rowan Cos. v. United States, supra* at 253; *Brown-Forman Corp. v. Commissioner*, 94 T.C. 919, 942 (1990), affd. 955 F.2d 1037 (6th Cir. 1992).

Where the Commissioner acts under a specific grant of authority, our primary inquiry is whether the regulation is not manifestly contrary to the statute and is not arbitrary or capricious. *Rowan Cos. v. United States, supra*; *Dresser Indus., Inc. v. Commissioner*, 911 F.2d 1128, 1137 (5th Cir. 1990) (citing *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984); *United States v. Morton*, 467 U.S.

---

[11] Under sec. 7805(a), the power to "prescribe all needful rules and regulations" is granted to the Secretary. The Secretary has delegated this power to the Commissioner, subject to the approval of the Secretary. Sec. 301.7805–1(a), Proced. & Admin. Regs. Accordingly, we speak in terms of the Commissioner's powers when analyzing this section. *Gehl Co. v. Commissioner*, 795 F.2d 1324, 1328 n.6 (7th Cir. 1986), affg. in part T.C. Memo. 1984–667.

822, 834 (1984); *Schweiker v. Gray Panthers,* 453 U.S. 34, 44 (1981); *Rowan Cos. v. Commissioner, supra; Batterton v. Francis,* 432 U.S. 416, 424–426 (1977)), affg. in part and revg. in part 92 T.C. 1276 (1989).

The regulations require all taxpayers to use the cash method of accounting for deducting interest payable to related foreign persons when the interest is not effectively connected with a trade or business within the United States. The regulatory requirement clearly applies to the interest that petitioner accrued. The question we must answer is whether this requirement is manifestly contrary to the mandate of the statute.[12]

Section 267(a)(3) authorizes regulations to apply the matching principle of section 267(a)(2). The matching principle of section 267(a)(2) is: An accrual basis taxpayer is not entitled to deduct any amount if it is payable to a related person and, *because of the payee's method of accounting,* the item is not currently includable in the payee's gross income. Our statement of the principle of section 267(a)(2) and our emphasis on the accounting method of the payee are consistent with respondent's published position in Notice 89–84:

Section 267(a)(2) of the Code provides generally that a taxpayer may not deduct any amount owed to a related party (as defined in section 267(b)) until it is includible in the payee's gross income *if the mismatching arises because the parties use different methods of accounting.* Section 267(a)(3) authorizes the Secretary to issue regulations applying *this principle* to payments to related foreign persons. * * * [1989–2 C.B. 402; emphasis added.]

The matching principle is triggered when:

(1) A taxpayer incurs an expense that would otherwise be deductible;

(2) the taxpayer and payee are related; and

(3) *by reason of the payee's method of accounting,* the item is not includable in the payee's income during the same year

---

[12] Petitioner argues that the matching principle has no application to its situation because PLC used the accrual method of accounting. Respondent argues that the matching principle of sec. 267(a)(2) focuses on the payee's method of accounting for purposes of U.S. taxation and that it is therefore irrelevant that PLC used the accrual method of accounting for other purposes. On this point, we agree with respondent. The purpose of sec. 267(a)(2) is to prevent avoidance of U.S. taxes that might otherwise result from mismatching deductions and corresponding income in transactions between related persons. It follows, therefore, that the accounting method to be used when applying sec. 267(a)(2) is the method used to determine *when* the item is includable in the payee's gross income for purposes of U.S. taxation.

that it would otherwise be deductible by the taxpayer. Each of these elements must be present before section 267(a)(2) becomes operative. The first two elements are clearly present in this case. We must decide whether the third element is present; i.e., whether by reason of PLC's method of accounting, the interest was not includable in PLC's gross income during the same year that it would otherwise be deductible by petitioner.

The Code does not define the term "method of accounting". The regulations provide that "The term 'method of accounting' includes not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item." Sec. 1.446–1(a)(1), Income Tax Regs. Section 446(a) provides that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446(b) provides that the method of accounting must clearly reflect income. Section 446(c) lists permissible methods of accounting: (1) The cash receipts and disbursements method; (2) an accrual method; (3) any other method permitted by chapter 1 of the Code; or (4) any combination of the foregoing methods permitted under the regulations prescribed by the Secretary.

The accrual and cash methods of accounting (and any combination thereof) are procedures and rules governing the timing of items of income and deductions. The underlying assumption of requiring that taxable income be determined by the taxpayer's "method of accounting" and that the method "clearly reflect income" is that the method of accounting involves *when* an item of income or expense is to be reported for tax purposes. See *Schlude v. Commissioner*, 283 F.2d 234, 236–237 (8th Cir. 1960), revg. 32 T.C. 1271 (1959), vacated on other issue 367 U.S. 911 (1961). Indeed, section 1.446–1(e)(2)(ii)(a) and (b), Income Tax Regs., provides that a change in a method of accounting involves the proper time for the inclusion of an item of income or the taking of a deduction. See *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500 (1989).

The total exclusion of an item from the recipient's gross income is a question of characterization that is unrelated to the taxpayer's method of accounting. In *Underhill v. Commissioner*, 45 T.C. 489, 496 (1966), we stated:

Critical to respondent's position is a determination that the situation involves a "method of accounting"—a phrase which, at times, appears to have certain chameleon qualities. Whatever may be the subtleties of a "method of accounting" we do not think that they concern us in the instant situation. The issue before us is the extent to which payments received by * * * [the taxpayer] are taxable or nontaxable—i.e., the character of the payment—not the proper method or time of reporting an item the character of which is not in question. * * * [Citations omitted.]

The characterization of an item determines *whether* that item is includable or not includable in gross income. A method of accounting for income only determines *when* an item is includable in income. As such, a method of accounting for gross income is irrelevant and never comes into play if the item is excluded from gross income. The interest owed to PLC was not includable in its gross income because it was excluded as a result of the U.S.-U.K. Income Tax Treaty, the Code, and the regulations (i.e., it did not constitute gross income for U.S. tax purposes), not because of any method of accounting.[13]

Respondent argues that the legislative history of section 267(a)(3) supports the regulations. She points out that both the House and Senate reports set forth an example wherein the regulations might require a taxpayer to use the cash method of accounting for deducting items payable to a related foreign payee even though the items are not subject to U.S. tax or generally includable in the recipient's gross income. The committee reports state:

For example, assume that a foreign corporation, not engaged in a U.S. trade or business, performs services outside the United States for use by its wholly owned U.S. subsidiary in the United States. That income is foreign source income that is not effectively connected with a U.S. trade or business. It is not subject to U.S. tax (or, generally includible in the foreign parent's gross income). Under the bill, regulations *could* require the U.S. subsidiary to use the cash method of accounting with respect to the deduction of amounts owed to its foreign parent for these services. * * * [S. Rept. 99–313, at 959 (1986), 1986–3 C.B. (Vol. 3) 1, 959; H. Rept. 99–426, at 939 (1985), 1986–3 C.B. (Vol. 2) 1, 939; emphasis added.]

---

[13] On brief respondent acknowledges that sec. 267(a)(2) involves an issue of timing, not character:

The respondent's regulation, in applying the matching principle of I.R.C. §267(a)(2), conditions the payor's deduction upon *when the foreign payee is required to include the payment in gross income under the Internal Revenue Code.* * * * [Emphasis added.]

We acknowledge that the above reference is troublesome in light of a literal reading of section 267(a) and its matching principle. However, the committee reports also acknowledge that at the time Congress was dealing with this legislation:

> The application of * * * [section 267(a)(2) was] unclear when the related payee is a related foreign person that does not, for many Code purposes, include in gross income foreign source income that is not effectively connected with a U.S. trade or business. [S. Rept. 99–313, *supra,* 1986–3 C.B. (Vol. 3) at 959; H. Rept. 99–426, *supra,* 1986–3 C.B. (Vol. 2) at 939.]

While the application of the principle of section 267(a)(2) to certain situations involving foreign payees may have been unclear, the statutory mandate in section 267(a)(3) that the regulations were to "apply the matching principle of paragraph (2)" is absolutely clear. An overall reading of the statute and legislative history does not permit the promulgation of regulations that go beyond applying the matching principle of section 267(a)(2).

The final regulations do *not* apply section 267(a)(2) and (3) to taxpayers described in the previously quoted example from the legislative history, nor do they require such taxpayers to use the cash method of accounting. Presumably, the persons responsible for drafting the regulations, upon reflection, did not believe that the matching principle of section 267(a)(2) applied. Thus, while section 1.267(a)–3(b)(1), Income Tax Regs., states that section 267(a)(3) generally requires a taxpayer to use the cash method of accounting with respect to the deduction of amounts owed to a related foreign person, section 1.267(a)–3(b)(2), Income Tax Regs., provides:

> Amounts other than interest that are from sources outside the United States, and that are not income of a related foreign person effectively connected with the conduct by such related foreign person of a trade or business within the United States, are not subject to the rules of section 267(a)(2) or (3) or this section. * * *

The regulations follow the same pattern in cases where the income of the related foreign recipient is exempt from U.S. taxation pursuant to a treaty. However, when the item is "interest", the regulations require the taxpayer to take the deduction on the cash basis even though the related recipient is exempt from U.S. tax. The regulations provide:

(2) *Items exempt from tax by treaty.* Except with respect to interest, neither paragraph (b) of this section nor section 267(a)(2) or (a)(3) applies to any amount that is income of a related foreign person with respect to which the related foreign person is exempt from United States taxation on the amount owed pursuant to a treaty obligation of the United States (such as under an article relating to the taxation of business profits). * * * Interest that is not effectively connected income of the related foreign person is an amount covered by paragraph (b) of this section, regardless of whether the related foreign person is exempt from United States taxation on the amount owed pursuant to a treaty obligation of the United States. [Sec. 1.267(a)–3(c)(2), Income Tax Regs.]

Why did the final regulations put taxpayers who accrue interest payable to a related foreign person on the cash method of accounting, even though the interest is not includable in the payee's gross income? The only discernable reason is that respondent wished to treat such interest deductions the same as deductions attributable to original issue discount as provided in section 163(e)(3). See T.D. 8465, 1993–1 C.B. 28. Section 163(e)(3) provides that no deduction for original issue discount on a debt instrument held by a related foreign person shall be allowed until paid. However, there is no provision in section 267 that refers to section 163(e)(3), nor is there any reference to section 163(e)(3) in the legislative history of section 267(a)(3). There is simply no provision that permits respondent to expand the reach of regulations under section 267(a)(3) beyond the matching principle of section 267(a)(2).

The interest payable to PLC was exempt from Federal tax and excluded from PLC's gross income pursuant to treaty. As a result, neither PLC's method of accounting (or any other method of accounting) had any bearing on the fact that the interest was not includable in PLC's gross income for purposes of Federal taxation. Neither the literal terms of section 267 nor its matching principle apply.[14] We therefore hold that the portion of the regulations that would preclude petitioner from accruing and deducting the interest owed to PLC is manifestly beyond the mandate of the statutory authorization and therefore is invalid.

Alternatively, even if section 1.267(a)–3, Income Tax Regs., were found to be a reasonable implementation of the congressional mandate, we believe that the retroactive application of

---

[14] We have generally adopted a literal approach with regard to sec. 267. See *Metzger Trust v. Commissioner,* 76 T.C. 42, 76 (1981), affd. 693 F.2d 459 (5th Cir. 1982).

the regulation to this case violates the Due Process Clause of the Fifth Amendment to the Constitution. In 1986, 2 years after it had enacted section 267(a)(2), Congress enacted section 267(a)(3) and made it applicable to all taxable years beginning after December 31, 1983. Thus, Congress intended that respondent issue regulations and that those regulations could apply retroactively. However, section 1.267(a)–3, Income Tax Regs., was not issued until December 31, 1992, approximately 7 years after Congress enacted section 267(a)(3). The portion of the regulations applicable to this case applies retroactively to all taxable years beginning after December 31, 1983—a 9-year period.[15]

Section 1.267(a)–3, Income Tax Regs., as written, is a legislative regulation. It was issued pursuant to a specific grant of authority in section 267(a)(3) and contains substantive rules that are legislative in character. In *Chevron U.S.A. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 843–844, the Supreme Court stated:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. * * *

See also *United States v. Morton,* 467 U.S. 822, 834 (1984) ("Congress explicitly delegated authority to construe the statute by regulation"); *Schweiker v. Gray Panthers,* 453 U.S. 34, 43 (1981) ("Congress explicitly *delegated* to the Secretary broad authority to promulgate regulations"); *Batterton v. Francis,* 432 U.S. 416, 425 (1977) (Congress "expressly *delegated* to the Secretary the power to prescribe standards"). In *Wing v. Commissioner,* 81 T.C. 17, 28 (1983), we concluded that a regulation was a "substantive rule, legislative in character" and not merely interpretative, because the regulation "was promulgated pursuant to specific statutory authority." In *Wing v. Commissioner, supra* at 28 n.14, we noted:

---

[15] The regulations provide:

The rules of this section are effective *with respect to interest* that is allowable as a deduction under chapter 1 (without regard to the rules of this section) in taxable years beginning after Dec. 31, 1983 * * *. The regulations in this document issued under section 267 apply to *all other deductible amounts* that are incurred after July 31, 1989 * * * [Sec. 1.267(a)–3(d), Income Tax Regs.; emphasis added.]

Accordingly, the rules were made retroactive for a period of approximately 9 years with respect to interest and for a period of approximately 2½ years with respect to all other deductible amounts. There is no adequate explanation for the different periods of retroactivity.

Congress' delegation of *legislative* rulemaking power was expressed in S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939–1 C.B. (Part 2) 409, 419, as follows:

"The Committee believes it to be impractical to attempt by legislation to prescribe the various detailed and complicated rules necessary to meet the many differing and complicated situations. Accordingly, it has found it necessary to delegate power to the Commissioner to prescribe regulations *legislative in character* covering them. * * * [Emphasis supplied.]"

The position taken by respondent in section 1.267(a)–3, Income Tax Regs., was more than a mere clarification of existing law.[16] It embodied new rules that were not required by section 267(a)(2). Respondent made choices with respect to what items would or would not be subject to section 267(a)(2). For example, respondent's regulations provide that deductible amounts, other than interest, that are from sources outside the United States, and that are not income of a related foreign person from a trade or business within the United States, are not subject to the rules of section 267(a)(2) or (3) or section 1.267(a)–3, Income Tax Regs. This same pattern was followed in cases where the income of the related foreign recipient is exempt from taxation pursuant to a treaty. Thus, except for interest, respondent would not require a taxpayer to use the cash method of accounting for items payable to a related foreign person where, pursuant to a treaty, the item is excluded from gross income for purposes of U.S. taxation. Only taxpayers who accrue *interest* payable to a related foreign party are subject to the cash method rule.[17]

---

[16] In T.D. 8465, 1993–1 C.B. 28, under a section titled "Discussion of Major Comments and Revisions to Proposed Regulations", respondent states:

Several commentators argued that the regulations under section 267(a)(3) governing the treatment of interest should be applied only prospectively, contending that the public had no notice that the statute would be applied in the manner described in the regulations. This comment also was rejected. Section 267(a)(2) provides generally that an otherwise deductible amount may not be deducted by the payor until the amount is includible in the gross income of the recipient. The legislative history makes clear that its provisions apply to otherwise deductible amounts owed to related foreign persons, and that regulations under section 267(a)(3) *would be necessary only to clarify* the application of the matching principle of section 267(a)(2) and (3) to amounts not includible in the gross income of the recipient for United States tax purposes. [Emphasis added; citation omitted.]

Respondent apparently views the regulations as being merely a clarification of the application of the matching principle. We disagree.

[17] There is no explanation for this disparate treatment. Such treatment is not required by the literal provisions of sec. 267(a)(3), nor is it suggested in the legislative history of sec. 267(a)(3). Indeed, the legislative history provided an example of when respondent *might* place a taxpayer on the cash method, but respondent chose not to follow this suggestion in sec. 1.267(a)–3, In-

Section 7805(b) provides that "The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." Respondent cannot, however, retroactively apply a regulation that is legislative in nature if such retroactive application would violate due process. Even tax statutes passed by Congress might run afoul of the Due Process Clause of the Constitution if "'retroactive application is so harsh and oppressive as to transgress the constitutional limitation.'" *United States v. Carlton,* 512 U.S. ___, ___, 114 S. Ct. 2018, 2022 (1994) (quoting *Welch v. Henry,* 305 U.S. 134, 147 (1938)). We do not think that this constitutional limitation is obviated when broad legislative type regulatory authority is given to an executive agency. Accordingly, we examine the retroactive application of section 1.267(a)–3, Income Tax. Regs., in light of *United States v. Carlton, supra.*[18]

In *United States v. Carlton, supra,* the Supreme Court upheld a tax statute that established a modest retroactivity period of slightly longer than 1 year. In the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2085, a new estate tax provision was enacted and made applicable to any estate that filed a timely return after October 22, 1986. *United States v. Carlton,* 512 U.S. at ___, 114 S. Ct. at 2020. The new provision, codified as section 2057, "granted a deduction for half the proceeds of 'any sale of employer securities by the executor of an estate' to 'an employee stock ownership plan.'" *Id.* To qualify for the deduction, the sale of securities had to be made before the date the estate tax return was required to be filed (including extensions). *Id.*

In *Carlton,* the decedent's estate's estate tax return was due December 29, 1986 (after a 6-month filing extension had

---

come Tax Regs.

[18] There has been some discussion regarding the standard that is applicable when a legislative regulation, as opposed to an interpretative regulation, is applied retroactively. See *Gehl Co. v. Commissioner,* 795 F.2d 1324, 1332 n.9 (7th Cir. 1986), affg. in part T.C. Memo. 1984–667; *Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 984 (5th Cir. 1977). Generally, the retroactive application of an income tax regulation has been reviewed for an abuse of discretion. *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 184 (1957).

In *Redhouse v. Commissioner,* 728 F.2d 1249, 1252 (9th Cir. 1984), affg. *Wendland v. Commissioner,* 79 T.C. 355 (1983), which involved the retroactive application of an income tax regulation, the Court of Appeals for the Ninth Circuit stated that the abuse of discretion standard is akin to a due process inquiry. See also *Wing v. Commissioner,* 81 T.C. 17, 36 (1983). In *Redhouse* and *Wing,* both abuse of discretion and due process concerns were analyzed with respect to the retroactive application of an income tax regulation.

been obtained). *Id.* at ____, 114 S. Ct. at 2021. On December 10, 1986, the executor of decedent's will used estate funds to purchase stock of MCI Communications Corp. Two days later, the executor sold the stock to the MCI employee stock ownership plan (ESOP). A deduction of one-half of the proceeds of the sale of stock to the ESOP was taken on the estate tax return.

On December 22, 1987, section 2057 was amended, and the amendment was made retroactive to October 22, 1986, the date section 2057 was originally enacted. *Id.* "As amended, the statute provided that, to qualify for the estate tax deduction, the securities sold to an ESOP must have been 'directly owned' by the decedent 'immediately before death.' Omnibus Budget Reconciliation Act of 1987, §10411(a), 101 Stat. 1330–432." *United States v. Carlton,* 512 U.S. ____, ____, 114 S. Ct. at 2021 (fn. ref. omitted). The Internal Revenue Service disallowed the deduction taken on the estate tax return. The taxpayer argued that "retroactive application of the 1987 amendment to the estate's 1986 transactions violated the Due Process Clause of the Fifth Amendment." *Id.*

In *Carlton,* the Supreme Court stated that it has repeatedly upheld retroactive tax legislation against due process challenges, and noted that it had previously stated that "the validity of a retroactive tax provision under the Due Process Clause depends upon whether 'retroactive application is so harsh and oppressive as to transgress the constitutional limitation.'" *Id.* at ____, 114 S. Ct. at 2022 (quoting *Welch v. Henry,* 305 U.S. at 147). According to the Supreme Court, the "harsh and oppressive" standard is the same as the "'prohibition against arbitrary and irrational legislation' that applies generally to enactments in the sphere of economic policy." *Id.* (quoting *Pension Ben. Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 733 (1984)). Therefore, if there is a legitimate legislative purpose that is furthered by a rational means, the retroactive tax provision will not be disturbed. *Id.*

In holding that the 1987 amendment met the requirements of due process, the Supreme Court analyzed two factors: "First, Congress' purpose in enacting the amendment was neither illegitimate nor arbitrary", and "Second, Congress acted promptly and established only a modest period of retroactivity." *Id.* at ____, 114 S. Ct. at 2022; see also *Furlong v.*

*Commissioner,* 36 F.3d 25 (7th Cir. 1994), affg. T.C. Memo. 1993–191.

As to the second element, the Court stated:

This Court noted in *United States v. Darusmont,* 449 U.S. [292, 296 (1981)], that Congress "almost without exception" has given general revenue statutes effective dates prior to the dates of actual enactment. This "customary congressional practice" generally has been "confined to short and limited periods required by the practicalities of producing national legislation. *Id.,* at 296–297. In *Welch v. Henry,* 305 U.S. 134 (1938), the Court upheld a Wisconsin income tax adopted in 1935 on dividends received in 1933. The Court stated that the "recent transactions" to which a tax law may be retroactively applied "must be taken to include the receipt of income during the year of the legislative session preceding that of its enactment. *Id.,* at 150. Here, the actual retroactive effect of the 1987 amendment extended for a period only slightly greater than one year. Moreover, the amendment was proposed by the IRS in January 1987 and by Congress in February 1987, within a few months of §2057's original enactment. [*United States v. Carlton,* 512 U.S. at ____, 114 S. Ct. at 2023.]

In *United States v. Carlton, supra,* the Supreme Court distinguished one of its earlier opinions, *Nichols v. Coolidge,* 274 U.S. 531 (1927). The Court stated that "*Nichols* involved a novel development in the estate tax *which embraced a transfer that occurred 12 years earlier.* The amendment at issue here certainly is not properly characterized as a 'wholly new tax,' and *its period of retroactive effect is limited." Id.* at ____, 114 S. Ct. at 2024 (emphasis added); see also *Furlong v. Commissioner, supra.* In her concurring opinion in *United States v. Carlton, supra,* Justice O'Connor reviewed some of the Court's precedents dealing with retroactive legislation.

As we have noted, "the retroactive aspects of economic legislation, as well as the prospective aspects, must meet the test of due process: a legitimate legislative purpose furthered by rational means."

\* \* \* \* \* \* \*

"the Court has never intimated that Congress possesses unlimited power to 'readjust rights and burdens \* \* \* and upset otherwise settled expectations.'" *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 229 (1986) \* \* \* quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16 (1976). The governmental interest in revising the tax laws must at some point give way to the taxpayer's interest in finality and repose. \* \* \*

Although there is also an element of arbitrariness in retroactively changing the rate of tax to which the transaction is subject, or the availability of a deduction for engaging in that transaction, our cases have recognized that Congress must be able to make such adjustments in an attempt to equalize actual revenue and projected budgetary requirements. In every

case in which we have upheld a retroactive federal tax statute against due process challenge, however, the law applied retroactively for only a relatively short period prior to enactment. See *United States v. Hemme,* [476 U.S. 558, 562 (1986)] (1 month); *United States v. Darusmont,* [449 U.S. 292, 294–295 (1981)] (10 months); *United States v. Hudson,* 299 U.S. 498, 501 (1937) (1 month). In *Welch v. Henry,* [305 U.S. 134 (1938)], the tax was enacted in 1935 to reach transactions completed in 1933; but we emphasized that the state legislature met only biannually and it made the revision "at the first opportunity after the tax year in which the income was received." 305 U.S., at 151. [*United States v. Carlton,* 512 U.S. at ___, 114 S. Ct. at 2025–2026 (O'Connor, J., concurring).[19]]

In *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730 (1984), the Court recognized that retroactive legislation has to meet a burden not faced by prospective legislation, and that while the retroactive aspects, as well as the prospective aspects, must satisfy the requirements of due process, the justifications for the latter may not suffice for the former. The Court went on to find that the retroactive application in issue in that case met the due process requirements because it was justified by a "rational legislative purpose." *Id.* In doing so, the Court emphasized that the retroactivity period was limited to the 5-month period preceding enactment and that the Court had previously upheld retroactive application of statutes that were confined to short and limited periods. *Id.* at 731.

Based on what the Supreme Court has said with respect to retroactive legislation, we conclude that the length of the retroactivity period is a very important consideration in any due process analysis. While it is apparent that relatively short periods of retroactivity will probably not run afoul of the Due Process Clause, longer periods will raise concerns, and at some point the retroactivity period may become so great that it could be successfully challenged on due process grounds. We believe that the same analysis is applicable to legislative regulations.

---

[19] Justice O'Connor went on to opine:

A period of retroactivity longer than the year preceding the legislative session in which the law was enacted would raise, in my view, serious constitutional questions. But in keeping with Congress' practice of limiting the retroactive effect of revenue measures (a practice that may reflect Congress' sensitivity to the due process problems that would be raised by overreaching), the December 1987 amendment to §2057 was made retroactive only to October 1986. Given our precedents and the limited period of retroactivity, I concur in the judgment of the Court that applying the amended statute to respondent Carlton did not violate due process. * * * [*United States v. Carlton,* 512 U.S. ___, ___, 114 S. Ct. 2018, 2025–2026 (1994) (O'Connor, J., concurring); citation omitted.]

For purposes of analyzing whether retroactive application of section 1.267(a)–3, Income Tax Regs., violates the Due Process Clause, we assume that the purpose in promulgating the regulations was neither illegitimate nor arbitrary. However, as to the second element analyzed by the Supreme Court in *Carlton,* we find that respondent did not act promptly and that the period of retroactivity was not moderate, but excessive.

In 1986, 2 years after it had enacted section 267(a)(2), Congress enacted section 267(a)(3) directing respondent to promulgate regulations that apply the matching principle of section 267(a)(2) to cases in which the person to whom the payment is to be made is a foreign person. Respondent announced no position until publication of Notice 89–84, 1989–2 C.B. 402,[20] dated July 31, 1989, approximately 4½ years after enactment of section 267(a)(3). On March 19, 1991, respondent published proposed regulations. 56 Fed. Reg. 11531 (Mar. 19, 1991). On December 31, 1992, section 1.267(a)–3, Income Tax Regs., was issued and made effective (with respect to the issue before us) for taxable years beginning after December 31, 1983, making it retroactive approximately 9 years.

Respondent's regulations contain rules that did not exist prior to issuance of the regulations.[21] Petitioner accrued and deducted interest payable to PLC on its tax returns for the periods ended September 29, 1985, September 28, 1986, and September 26, 1987. These returns were due and filed long before respondent issued any notice, proposed regulations, or final regulations. As applied to the 3 years in issue, the regulations' retroactivity period ranges from in excess of 5 to in excess of 7 years. At the time the regulations were finally issued, assessments of tax against taxpayers who had similar transactions for corresponding tax periods, would have long

---

[20] Notice 89–84, 1989–2 C.B. 402, 403, provided that it was to serve as "an 'administrative pronouncement' as that term is described in section 1.6661–3(b)(2) * * * and may be relied on to the same extent as a revenue ruling or revenue procedure." With respect to the issue before us, the rules of Notice 89–84 were also made effective for taxable years beginning after Dec. 31, 1983.

[21] In our discussion regarding the validity of sec. 1.267(a)–3, Income Tax Regs., we described what we believe to be the proper interpretation of sec. 267(a)(2) and the manner in which respondent's regulations diverge from that interpretation. While we are presuming, for purposes of analyzing retroactivity, that the rules contained in the regulations are permissible legislative regulations and within the broad mandate of sec. 267(a)(3), such an assumption does not obviate what we consider to be the proper interpretation of sec. 267(a)(2), absent the issuance of sec. 1.267(a)–3, Income Tax Regs., on Dec. 31, 1992.

been barred by the normal 3-year period of limitations under section 6501(a). When the petition in this case was filed, no regulations had been issued. Section 1.267(a)–3, Income Tax Regs., was issued almost 1 year after the commencement of this case and 10 months after the date the answer was filed and the issues were joined. Had the case been litigated and decided during those 10 months, there would have been no regulations upon which respondent could rely.[22]

The period of retroactivity in this case is excessive, rather than modest. Under the facts presented in this case, we find the retroactive application of section 1.267(a)–3, Income Tax Regs., to petitioner to be unduly harsh and oppressive. Accordingly, we hold that the regulation, as applied to petitioner, violates the Due Process Clause. It follows that petitioner is entitled to accrue the interest deductions payable to PLC.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

JACOBS, COLVIN, and LARO, *JJ.,* agree with this majority opinion.

WHALEN, *J.,* concurs in the result only.

---

CHIECHI, *J.,* concurring: I write separately to explain that I concur in the result reached by the majority and its holding that, to the extent section 1.267(a)–3, Income Tax Regs., requires petitioner to deduct interest payable to PLC using the cash method, it is invalid because it does not apply the matching principle of section 267(a)(2). However, I do not agree with, and therefore do not join in, the majority's conclusion that, even if that regulation were valid, its retroactive application from the date it was issued on December 31, 1992, to petitioner's taxable years ended September 29, 1985, September 28, 1986, and September 26, 1987, violates

---

[22] It has been previously suggested that respondent should not take advantage of the power to apply a regulation retroactively during the course of litigation for the purpose of providing a defense. See *Chock Full O' Nuts Corp. v. United States,* 453 F.2d 300 (2d Cir. 1971); *Miller v. Commissioner,* 84 T.C. 827, 842 (1985), revd. 836 F.2d 1274 (10th Cir. 1988). But see *Wilson v. United States,* 588 F.2d 1168, 1172 (6th Cir. 1978); *Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 980 (5th Cir. 1977).

the Due Process Clause of the Fifth Amendment to the Constitution.

CHABOT, COHEN, and WELLS, *JJ.,* agree with this concurring opinion.

---

SWIFT, *J.,* dissenting: At the risk of oversimplifying what the majority opinion and the parties in this case apparently view as a complicated question of statutory interpretation, I offer the following comments.

As I read and understand the relevant statutory scheme, I believe the majority opinion reads or defines the "matching principle" of section 267(a)(2) too narrowly. Also, in interpreting the reference in section 267(a)(3) to the "matching principle" of section 267(a)(2), the majority confuses the "matching principle" with the specified reason or cause for a mismatch that, under section 267(a)(2), triggers the correction contemplated by section 267.

The general matching principle of section 267 may be simply stated: mismatches in the Federal income tax reporting and treatment of associated items of income and expense between related parties are generally to be avoided. Under section 267(a)(2), which applies generally where both parties are domestic taxpayers, the matching principle will be triggered and section 267 will correct a mismatch only where the "reason" (see the express language of section 267(a)(2)(A)) or the cause for the mismatch is a difference in the "accounting method" used by the related parties. That specified reason or cause for a mismatch (namely, a difference in accounting method) that triggers corrections under section 267(a)(2)(A) is not part of the "matching principle" itself. Rather, it is only the "trigger"—the specified reason or cause—for section 267 corrections where related domestic taxpayers are involved.

In 1986, Congress added section 267(a)(3) in recognition of the fact that (where a domestic taxpayer and a related foreign party are involved) the reason or cause for a mismatch may well be something other than a difference in an accounting method (e.g., a treaty provision). Section 267(a)(3) clarifies and expands the scope and reach of the matching principle of section 267 to include other situations where the

matching principle is violated (i.e., other reasons and causes for mismatches) as between domestic taxpayers and related foreign parties. Rather than attempt to anticipate and to specify in section 267 other reasons and causes for mismatches as between domestic taxpayers and related foreign parties, Congress provided in section 267(a)(3) that respondent by legislative regulations is to provide the other reasons and causes for mismatches between domestic taxpayers and related foreign parties that appropriately trigger corrections under section 267.

Respectfully, in my opinion, it is apparent that a treaty may represent the reason and cause for a mismatch in the tax reporting and treatment of items of income and expense as between domestic taxpayers and related foreign parties, and the conclusion is compelling that respondent has been delegated regulatory authority under section 267(a)(3) to provide that such a reason and cause for a mismatch will trigger the correction contemplated by section 267.

The fact that a treaty constitutes the reason and cause for the mismatch at issue in this case, rather than a method of accounting, neither alters the fact of the mismatch, the significance and effect of the mismatch, the policy of section 267 to correct mismatches between related parties, nor the appropriateness of the correction respondent seeks to make in this case. Both reasons for a mismatch are covered by section 267. A mismatch caused by reason of a difference in a method of accounting is covered by section 267(a)(2). A mismatch caused by reason of a treaty is covered by the legislative regulations promulgated under section 267(a)(3).

Alternatively, if the majority is correct and if the "accounting method" is part of the "matching principle" itself (and not just the specifically stated reason for the type of mismatch that is corrected under section 267(a)(2)), I would then conclude that the treaty provision at issue in this case constitutes a "treaty-mandated" method of accounting, and I would sustain respondent's adjustment on the ground that the mismatch in question was caused "by reason of" a difference in the method of accounting for the interest income.

Under this alternative approach, the correction respondent has made in this case under section 267 would also be sustained.

PARR, *J.*, agrees with this dissent.

---

GERBER, *J.*, dissenting: I respectfully dissent from the majority opinion. Although the profusion of concurring views about and distractions from the "majority" opinion somewhat obscure its thrust, the ostensible plurality favors either invalidating section 1.267(a)–3(c)(2), Income Tax Regs., and/or holding that the retroactive application of the regulation, if assumed valid, violates the Due Process Clause of the Fifth Amendment to the Constitution.

A. *Invalidation of Section 1.267(a)–3(c)(2), Income Tax Regs.*—I disagree with the majority's invalidating the regulation for the following reasons: (1) The regulation is a reasonable interpretation of the existing law, and its invalidation would cause anomalous results; (2) the U.S.-U.K. Income Tax Treaty[1] does not characterize or recharacterize the (interest) income; instead, it renders it exempt from tax if and when it is otherwise recognizable; and (3) the legislative history supports the substance of the regulation as promulgated.

(1) *Section 1.267(a)–3(c)(2), Income Tax Regs., Is a Reasonable Interpretation of the Law and Is Thus Valid*—Section 267 requires a matching of deduction and income items to prevent artificial deductions from occurring when related parties have different accounting methods. Majority op. p. 659. That purpose is accomplished through section 267(a)(2), which prohibits a deduction until such time as the income is recognizable by the payee.

The majority, although supplying appropriate case precedent by which to consider a regulation, has not sufficiently explained why section 1.267(a)–3(c)(2), Income Tax Regs., does not constitute a reasonable interpretation of congressional intent underlying section 267. This is especially so

---

[1] Use of the term "U.S.-U.K. Income Tax Treaty" in this dissent denotes reference to the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, Dec. 31, 1975, U.S.-U.K., 31 U.S.T. 5668.

because the example contained in the legislative history was followed in the questioned regulation.

But for the U.S.-U.K. treaty, the majority agrees with respondent's position that, if sections 881(a)(1) and 1442(a) constitute a method of accounting, section 267(a)(2) requires actual payment before a domestic payor would be entitled to deduct interest payable to a foreign payee. Accordingly, if interest income was not excludable from tax under the treaty, the majority agrees with respondent's position that no deduction would be permissible until the interest was paid.[2] In that regard, the parties in this case are and were subject to section 267(a)(2), irrespective of the promulgation of section 1.267(a)–3(c)(2), Income Tax Regs.

Two years after enacting section 267(a)(2), Congress, however, acknowledging that there may be differences when foreign payees are involved, provided in section 267(a)(3) that the Secretary promulgate regulations to accomplish the same objective (i.e., matching principles) as in section 267(a)(2) where foreign payees are involved. Drawing upon the explanation and example contained in the legislative history for section 267(a)(3), the Secretary promulgated section 1.267(a)–3(c)(2), Income Tax Regs., requiring the cash method approach to deductibility by the payor even though the foreign payee were exempt from U.S. taxation. That regulation section is limited to interest income and not to income items in general.[3]

Section 267(b), to some extent, defines the breadth of section 267 by extending it to various related parties. Further, the reference to foreign payees in section 267(a)(3) reflects congressional intent that they be subjected to the matching principles of section 267(a)(2). The majority's holding that a payor is not subject to section 267 because the income would be exempt from tax when paid circumvents that congressional intent. More specifically, Congress did not relieve tax-

---

[2] The majority also agrees with respondent's position that the matching principle of sec. 267(a)(2) is focused upon the avoidance of U.S. tax, and it is irrelevant that the payee was on the accrual method for all purposes in the United Kingdom.

[3] If the terms of the treaty are not employed to exempt petitioner from the requirements of sec. 267(a)(2), it would have been unnecessary for the Government to issue regulations for circumstances involving foreign payees, because they were already subject to the sec. 267(a)(2) provisions. It is likely that the Government issued the regulations in question in order to relate the decision that the matching principles of sec. 267(a)(2) would not apply to income other than interest. Excepting interest, the failure to include other income is not (as suggested by the majority) a reason to find that the Secretary's position on interest is incorrect.

payers from the requirements of section 267 where one of the related members is tax-exempt under section 501. See sec. 267(b)(9). It, therefore, does not follow that, if an entity is exempt from tax and the related entities are subject to section 267, an otherwise taxable entity that is exempt from some portion of its income, especially under a treaty, would result in the related entities' not being subject to section 267. Although the majority attempts to technically distinguish between an exempt organization and being exempt from tax, it has not provided a congressional purpose for making such a distinction here. Majority op. p. 665 note 10. In that same vein, how would the majority's holding affect domestic taxpayers if the amount received is exempt from tax? For example, the "payee" may receive compensation for injuries or sickness which is exempt from income under section 104.[4]

(2) *The U.S.-U.K. Income Tax Treaty*—The majority concludes that, because the U.S.-U.K. treaty excludes the interest from the foreign payee's gross income, such income will never be subject to the accounting method contained in sections 881(a)(1) and 1442(a). I agree that the U.K. company will have no U.S. tax liability with respect to the interest; however, I must disagree with the majority's conclusion that, because the income is tax exempt, it is or becomes nonexistent for purposes of the accounting method requirements of sections 881(a)(1), 1442(a), and 267. The character of income is not changed simply because a treaty provides relief from part or all of the tax of one of the treaty countries. Rather, the U.S.-U.K. treaty simply has the effect of eliminating the U.S. tax.

The majority has failed to state or interpret the language or intent of the treaty in question.

Any effort to ascertain the intent of the parties to any agreement must begin with the language in the agreement itself. The plain meaning of treaty language controls unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180 (1982), quoting *Maximov v. United States,* 373 U.S. 49, 54 (1963). [*Rust v. Commissioner,* 85 T.C. 284, 288 (1985).]

Additionally, it should be noted that—

---

[4] The general rule of sec. 104 states that "gross income does not include" certain specified items enumerated in the statute.

In construing a treaty, courts should give great weight to the meaning ascribed by the Government departments charged with negotiation and enforcement of the treaty. *Kolovrat v. Oregon,* 366 U.S. 187, 194 (1961); *Factor v. Laubenheimer,* 290 U.S. 276, 295 (1933); *State of Minnesota v. Block,* 660 F.2d 1240, 1258 (8th Cir. 1981). * * * [*Id.*]

In this regard, petitioner did not advocate the legal analysis used by the majority to reach its conclusion that section 267 was inapplicable or that the regulation in question is invalid. Conversely and more significantly, respondent, on brief, did not even address the legal theory of the majority.[5]

As a matter of current law, "the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being a treaty or law." Sec. 7852(d)(1); see also sec. 894(a). Under that standard, courts should attempt to harmonize statutes and treaties under the same rules as are applied to seemingly conflicting statutes. See *Whitney v. Robertson,* 124 U.S. 190 (1888).[6] It is unlikely that a statute or treaty was intended to be abrogated or modified by a subsequent statute or treaty without some acknowledgment by Congress. See, e.g., *Cook v. United States,* 288 U.S. 102, 120 (1933). Here, the majority has, in a rote manner, used the income exemption feature of the treaty to relieve domestic taxpayers from the congressionally intended requirements of section 267 without any showing of how such a result serves congressional intent.

The majority's holding is wholly dependent upon its interpretation of the section 267 "includible in gross income" language and reasoning that the treaty, with the assistance of section 894, causes the income not to be gross income, and, therefore, section 267 does not apply. The majority's unprecedented and out-of-context use of a few words from the statute and treaty results in a non sequitur. To the extent that the majority holds that the treaty or section 894 redefines the term "interest income" as no longer constituting income or gross income, the majority's reasoning is faulty and without support. The majority's reasoning is based upon its own

[5] On brief, respondent quoted the nondiscrimination portion of the treaty and explained that it was not violated by the regulations in question.

[6] See also Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 66.2.11, at 66–26 (2d ed. 1991).

novel axiom that exempting income from taxation causes it to no longer be income or gross income.[7]

Suppose, instead, that the treaty provided for a rate reduction from 30 to 5 percent.[8] There is no doubt that, despite its lower tax rate, the interest remains income. In the same vein, if one-half of the income was exempt from tax, all of the interest would remain income, but only one-half would be subject to tax. In this case, because interest income was made exempt from the U.S. tax, the majority finds no matching or need to match because there is no income by virtue of its total exclusion. The majority, by use of language from the treaty and section 894, inexplicably removes the taxpayers in this case from the requirements of section 267.[9]

The agreement between the United States and the United Kingdom to exempt the foreign payee from U.S. tax does not relieve the parties from the requirements of section 267 or vary cash method accounting principles mandated by Congress and implemented in the regulations by the Secretary. The treaty does not change the accounting method; rather, it determines just which treaty country will ultimately tax the income. The United Kingdom will properly tax the foreign

---

[7] One might ask that, if, as the majority holds, the treaty causes the payments to the foreign payee not to be income or gross income, would the domestic payor be entitled to a deduction at all? Clearly, that could not occur under the language and intent of sec. 267. It is only by circumventing sec. 267 or finding a way to avoid its requirements that the majority has found the means to permit a deduction without a payment. The exemption of the foreign payee is certainly not a valid or appropriate reason for preempting the requirements of sec. 267.

[8] Absent a treaty, sec. 881(a) imposes a flat 30-percent tax on, inter alia, U.S.-source interest received by a foreign corporation.

[9] The majority reads sec. 267 and the U.S.-U.K. treaty in a vacuum, overlooking the need for symmetry in the Internal Revenue Code or between the Code and the treaty. For example, in defining subpt. F income, sec. 952(b) contains, in part, the following:

In the case of a controlled foreign corporation, subpart F income does not include any item of income from sources within the United States which is effectively connected with the conduct by such corporation of a trade or business within the United States *unless such item is exempt from taxation (or is subject to a reduced rate of tax) pursuant to a treaty obligation of the United States.* * * [Emphasis supplied.]

This example illustrates how an item of income may be exempt under one provision and includable under another provision of the Internal Revenue Code. Further, it shows how an exemption from tax under a treaty does not cause recharacterization or reclassification of the income item. Rather, it resolves which country will receive tax revenue or under which portion of the Internal Revenue Code the income item will be subject to tax.

The majority inadvertently makes the same point, majority op. p. 665 note 10, where it explains that the fact that an organization is tax exempt does not, per se, change the character or nature of income, unless received for an exempt purpose; i.e., the items received by an exempt organization may constitute unrelated business income that is subject to tax. Although the majority makes this distinction, it fails to take account of it in its reasoning and ultimate conclusion that the treaty's exemption from gross income causes recharacterization of the item for purposes of sec. 267 and the regulations thereunder.

payee's interest because it is income. The treaty's role is not to characterize or recharacterize income as "not being income"; instead, it simply frees it, ultimately, from U.S. tax.

Finally, the effect of a tax treaty should not be considered until after a determination is made under the tax law of the respective nations.[10] In other words, one must first determine if the item is income, and then it may or may not be exempt, depending on the treaty. In this case, it appears that the treaty section exempting the foreign affiliate from U.S. taxation on the interest was intended to avoid double taxation to the foreign affiliate because the interest income was already subject to foreign taxation. Treaties normally deal with that concern, and there is no justification for the majority's use of treaty language to color or characterize the nature of income of one of the treaty nations. Here, use of the U.S.-U.K. treaty income exemption to preempt a method of accounting requirement under the tax law of one of the treaty nations is an illogical sequence of cause and effect and could not have represented the intent of the treaty or statute in question. Additionally, such use of a treaty's language to justify different treatment for U.S. taxpayers with similar circumstances is even more inappropriate. The accounting standard is deductibility upon payment, irrespective of whether the payee has been specifically exempted from tax upon receipt. The regulation has not gone beyond the matching principle of section 267 as suggested by the majority, but instead has adapted it for foreign payee situations as recommended by Congress.

(3) *Legislative History*—The majority notes that both the House and Senate committee reports concerning section 267(a)(3) contemplate the deductibility of "items payable to a related foreign payee even though the items are not subject to U.S. tax or generally includable in the recipient's gross income." Majority op. p. 669. In that regard, the committee

---

[10] In Bittker, Federal Taxation of Income, Estates and Gifts, par. 66.8.2, at 66–21 (1981), it is stated that

In determining the effect of a particular treaty, the practitioner must bear in mind that the Internal Revenue Code is the starting point; treaty provisions reduce or eliminate U.S. tax liabilities, but they do not create them. * * * Once it is determined that an item is made taxable by the Internal Revenue Code, however, it is necessary to consult the appropriate treaty, if there is one, to ascertain whether the item qualifies for an exemption, reduced rate of tax, or other allowance.

reports contain an example for purposes of implementing section 267(a)(3) that is inclusive of the requirements of the regulations promulgated by the Secretary under section 267(a)(3). The only differences between section 1.267(a)–3, Income Tax Regs., and the congressional example are that the example did not concern interest income, and the foreign payee in the example was not subject to U.S. tax because it received foreign-source income, rather than being exempted from the U.S. tax by treaty. In line with the example, the committee reports proceed with the statement that the "regulations could require the U.S. subsidiary to use the cash method of accounting with respect to the deduction of amounts owed to its foreign parent". S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1, 959; H. Rept. 99–426 (1985), 1986–3 C.B. (Vol. 2) 1, 939.

While the majority finds this legislative history "troublesome", it reflects congressional intent and, therefore, in my view, provides substantial support and authority for the questioned regulation. The majority emphasizes that the final regulations did not include income other than interest income. The exclusion of income other than interest income is not the subject of this case. This case concerns a petitioner with interest income, and we do not have to decide whether other portions of the example or regulations should be sustained. In considering the issue before us, we must recognize that the principle of the example goes beyond and is inclusive of the requirements contained in the regulation under consideration.

(4) *Conclusion*—While the majority correctly notes that "our primary inquiry is whether the regulation is not manifestly contrary to the statute and is not arbitrary or capricious", majority op. p. 666, I cannot conclude, as it does, that limiting the payor to a cash method deduction is manifestly contrary to the statutory mandate under section 267(a)(3). To the contrary, I find that the regulations "apply the matching principle of paragraph [(a)](2)". Sec. 267(a)(3). The substance of section 267(a)(2) is that a related party expense or interest item must be deducted by the payor when the "amount is includible in the gross income of the [payee]". Thus, the "matching principle of paragraph (2)", in substance, requires the payor to report deductions on the cash method. The regu-

lations promulgated under section 267(a)(3), in my view, are entirely consistent with the statutory mandate. The majority's attempt to find contradiction in "the matching principle of [section 267(a)(2)]" and the cash method requirement found in the regulations under section 267(a)(3) is, at best, one of semantics.

B. *Retroactive Application Under the Circumstances Here Is Not a Violation of Due Process*—Generally, I disagree that the retroactive application of the statute and regulation here was violative of petitioner's due process because: (1) It merely clarified the application of the principles in section 267(a)(2) for foreign payees; (2) section 267(a)(2), enacted in 1984, already encompassed the foreign payee situation; (3) Congress, in enacting section 267(a)(3), provided examples that included the circumstances involved in this case and thereby placed petitioner on notice; (4) the regulation does not preclude a deduction; it merely concerns timing and places similarly situated taxpayers on a par and, therefore, does not cause the harsh result suggested by the majority; and (5) delay in issuance is not, per se, a denial of due process where there is no change in the law.

The majority agrees that section 267(a)(2) applies to both domestic and foreign parties. More importantly, the majority acknowledges that Congress enacted section 267(a)(3) to cause the matching principle of section 267(a)(2) to apply to foreign parties. Finally, the majority agrees that, but for the treaty, the timing provisions of sections 881(a)(1) and 1442(a) constitute the method of accounting for the interest in question under section 267. In its alternative holding, the majority's premise is that the regulation is a valid interpretation of the statute. If the majority were true to its premise or assumption, then section 267(a)(2) would have been the law when petitioner's income tax returns were filed and when the questioned regulation was issued. The majority clings to its view concerning the effect of the treaty in order to reach the conclusion that there was a due process violation.

Considering these premises, the majority is wrong to ignore the fact that section 267(a)(2) already compelled the result that respondent clarified in section 1.267(a)–3(c)(2), Income Tax Regs. Implying that taxpayers were without guidance until 1992 when the regulation was issued over-

states the situation. Albeit legislative, the regulation at issue does not contain the promulgation of a new substantive rule as the majority suggests. In the setting of this case, we must focus on the fact that the regulation treats interest consistently with the matching principles of section 267(a)(2), as Congress mandated. The majority implies that respondent's choice to include interest in the regulation and to relieve taxpayers with deductions not involving interest from the section 267 requirements resulted in a substantive rule of law. This focus is incorrect because interest is the subject of this case, and it would have been subject to section 267(a)(2).

The time lapse between the filing of the income tax returns and the issuance of the regulation is not as significant in considering whether due process has been afforded in this case. Where, as here, the regulation does not change the law or establish a new substantive rule of law, the result could have been expected and is not violative of a taxpayer's right of due process. In *United States v. Carlton,* 512 U.S.____, 114 S. Ct. 2018 (1994), the Supreme Court, in discussing the question of reliance, quoted Justice Stone's explanation that

"Taxation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract. It is but a way of apportioning the cost of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens. Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process. . . ." [*United States v. Carlton,* 512 U.S. at ____, 114 S. Ct. at 2023 (quoting *Welch v. Henry,* 305 U.S. 134, 146–147 (1938)).]

In this case, the interval between the enactment of section 267(a)(2) and (3) was about 2 years. The Commissioner also issued public notice of her position between 4 and 5 years after enactment of section 267(a)(3). Section 1.267(a)–3(c)(2), Income Tax Regs., was promulgated about 9 years and 7 years after section 267(a)(2) and (3), respectively. The tax returns in question were filed approximately 5 to 7 years before the regulation was issued. In any event, the statement of the law in the various enactments, notices, and regulations that followed section 267(a)(2) was the same law and matching principle already contained in section 267(a)(2). In these circumstances, it is curious that petitioner would have been surprised by the requirement of the regulation or that due process would be made an issue. Indeed, petitioner did not

raise or argue constitutional due process. The due process discussion is a creation of the majority and without the counsel of the parties.

By way of comparison, this Court has issued opinions deciding what the substance of a regulation would have been, but which the Secretary had failed to issue until some 8 to 18 years after Congress had so mandated.[11] In those instances (involving sections 58(h) and 2032A) Congress had failed to legislate because of complexity or some other reason and mandated that the Secretary issue legislative regulations establishing the substantive rules of law. Conversely, our issuing those substantive rules of law 8 to 18 years after congressional mandate far exceeds the period we consider here, under circumstances where the regulation merely clarifies the statute.

Finally, the majority lapses into the question of the regulation's validity in deciding whether due process has been afforded, even though it assumes the regulation to be valid. The majority, relying on *United States v. Carlton, supra,* decides that there was a lack of due process because the "retroactive application is so harsh and oppressive as to transgress the constitutional limitation." Majority op. p. 674 (quoting *United States v. Carlton,* 512 U.S. at ___, 114 S. Ct. at 2022). In this regard, the majority assumes the regulation to be neither illegitimate nor arbitrary. Although the majority's ostensible focus is intended to consider the time within which respondent acted, its reasoning lapses into and relies upon its finding that the regulation is invalid. See majority op. p. 678 note 21. Its holding that the effect of the regulation is unduly "harsh and oppressive" does not follow if the majority was true to its assumption that section 267(a)(2) would cause the same result as the regulation merely clarifies. The majority finds the regulation to be harsh and oppressive solely due to the lapse of time.

Accordingly, I must respectfully dissent from the majority's holding that section 1.267(a)–3(c)(2), Income Tax Regs., is invalid or, if valid, results in a due process violation.

---

[11] *Estate of Hoover v. Commissioner,* 102 T.C. 777, 784 (1994); *Estate of Maddox v. Commissioner,* 93 T.C. 228, 233–234 (1989); *First Chicago Corp. v. Commissioner,* 88 T.C. 663, 676–677 (1987), affd. 842 F.2d 180 (7th Cir. 1988); *Occidental Petroleum Corp. v. Commissioner,* 82 T.C. 819 (1984).

HAMBLEN, PARKER, SWIFT, and PARR, *JJ.,* agree with this dissent.

---

HALPERN, *J.,* dissenting: Respondent has required petitioner to defer its deductions for interest paid to its foreign parent until such time as such interest actually was paid. Respondent has changed petitioner from the accrual method of accounting to the cash method of accounting with regard to such interest on the authority of section 267(a)(2) and section 1.267(a)–3(b), Income Tax Regs. (section 1.267(a)–3(b)). Believing that it has determined the matching principle inherent in section 267, the majority invalidates section 1.267(a)–3(b) on the basis that it violates such principle. For good measure, it states that, assuming that the regulation were not invalid, retroactive application of it to the years here in issue violates due process. I can agree on neither count and, thus, dissent.

## Matching Principle

The majority states:

The matching principle of section 267(a)(2) is that an accrual basis taxpayer is not entitled to deduct an accrued item if the accrued item is payable to a related person, and the item is not currently includable in the payee's gross income because of the payee's method of accounting. * * * *When* this principle applies, deductions must be deferred *until* the expense item *is includable* in the gross income of the person to whom the payment is to be made. [Majority op. p. 661; emphasis added.]

The majority determines that the related person in this case (the foreign parent) has no gross income on account of the interest in question because of the combined terms of the treaty and the Internal Revenue Code. Majority op. p. 665. Accordingly, the majority concludes:

An overall reading of the statute and legislative history does not permit the promulgation of regulations that go beyond applying the matching principle of section 267(a)(2). [Majority op. p. 670.]

For the majority the matching principle comes into play if, and, only if, by reason of the method of accounting of the related payee, a mismatch occurs. See majority op. p. 661. For the majority, a mismatch occurs when "the item is not

includable in the payee's income during the same year that it would otherwise be deductible by the taxpayer." Majority op. pp. 667–668. The majority concludes, quite logically, that, if an item is excluded from gross income (for instance, because of a treaty), then the recipient's method of accounting for that item is irrelevant for determining gross income:

A method of accounting for income only determines *when* an item is includable in income. As such, a method of accounting for gross income is irrelevant and never comes into play if the item is excluded from gross income. * * * [Majority op. p. 669.]

If, because the item is excluded from gross income, the related payee's method of accounting for the item is irrelevant to a determination of gross income, then, to the majority, a match is impossible, and the matching principle can have no application. At a purely technical level, the majority seems to be saying that it will not read the statute to require it (the majority) to make an inquiry that it views as senseless; i.e., what is a related person's method of accounting for something it doesn't have? There is, of course, a certain force to such reasoning. Were it not for another portion of section 267, I would be persuaded.

*Section 267(b)(9)*

Section 267(b)(9) includes in the list of relationships that are subject to the rule of section 267(a)(2) the following:

A person and an organization to which section 501 (relating to certain educational and charitable organizations which are exempt from tax) applies and which is controlled directly or indirectly by such person or (if such person is an individual) by members of the family of such individual; * * *

With certain exceptions, organizations to which section 501 applies (section 501 organizations) are exempt from tax. See sec. 501(a). Whether or not such organizations technically have gross income is not, I think, the point. The point is that the inclusion of section 501 organizations and their controlling persons within the relationships subject to section 267(a)(2) brings into question the unstated policy consideration inherent in the majority's technical analysis; i.e., that there is no abuse if timing makes no difference (because the item does not constitute gross income) to the recipient. Section 267(b)(9) leads to the conclusion that, at least in some

circumstances, not paying tax on the amount received is not that important to Congress. The missing piece is *why* not paying tax is unimportant to Congress.[1]

The legislative history of section 267(b)(9) is not illuminating. The provision came into the Code in 1954, and it is thought to have been the legislative response to the decision of this Court in *Kaplan v. Commissioner,* 21 T.C. 134 (1953). See Mertens, Law of Federal Income Taxation, Code Commentary, sec. 267(b):1, at 1332 n.6 (1989). In *Kaplan,* the Court allowed the taxpayer to deduct a loss under the predecessor of section 267(a)(1) on the sale of stock to a tax-exempt membership organization controlled by the taxpayer and his family, since the predecessor of section 267(b)(2) did not encompass control of a nonstock corporation. Reports of both the Committee on Ways and Means and the Committee on Finance use virtually identical language to describe the operation of new section 267(b)(9). For example, the report of the Committee on Finance states:

> In transactions between related taxpayers present law denies losses on sales or exchanges of property and deductions for unpaid expenses or interest.
>
> The House and your committee's bill tightens present law by expanding the concept of related taxpayers to include * * * (3) an exempt organization controlled by a person or his family. Dealings between these parties are no less subject to abuse than those covered by present law.
>
> [S. Rept. 1622, 83d Cong., 2d Sess. 38 (1954).]

See also H. Rept. 1337, 83d Cong., 2d Sess. 32 (1954). Although section 267(b)(9) may have been enacted in response to *Kaplan,* there is nothing in the statute (the 1954 Code version or presently) to indicate that section 501 organizations and their controlling persons are not equally subject to *both* the loss disallowance rule of 267(a)(1) *and* the unpaid expense rule of section 267(a)(2). Indeed, the legisla-

---

[1] Congress' reason may have been simply to discourage the accrual of a deduction for an amount that, because of the close relationship between the payor and payee, might never be paid. Cf. H. Rept. 1546, 75th Cong., 1st Sess. (1937), 1939–1 C.B. (Part 2) 704, 724–725. H. Rept. 1546 accompanied H.R. 8234, 75th Cong., 1st Sess. (1937), which became the Revenue Act of 1937, ch. 815, 50 Stat. 813. Sec. 301 of the Revenue Act of 1937 added a new subsec. (c) to sec. 24 of the Revenue Act of 1936, ch. 690, 49 Stat. 1648. That subsec. (c) is the precursor to sec. 267(a)(2). At the cited pages of H. Rept. 1546, the Ways and Means Committee, in describing the abuse that the new rule of subsec. (c) was designed to counter, includes nonpayment: "Since the creditor was on a cash basis, he reported no income and thus the sum involved escaped income tax altogether, for usually in these cases *if the payment were finally made* it was done at a time when the creditor had offsetting losses." (Emphasis added.) Of course, a similar potential exists if the payee is a foreign person, exempt or not exempt from the income tax.

tive history does not differentiate between such categories in describing the operation of new section 267(b)(9). There is no case on point. I would conclude that, for whatever reason, Congress intended the rule of present section 267(a)(2) to apply to section 501 organizations and their controlling persons.

To me, the application of section 267(a)(2) to section 501 organizations and their controlling persons brings into question the implicit limitation that the majority finds in the matching principle of section 267(a)(2). Since it is unclear why section 267(a)(2) applies to section 501 organizations and their controlling persons (which I believe it does), it is difficult for me to see how one reason for not paying tax (i.e., exemption from paying tax) should be treated differently than any other reason (i.e., the item does not constitute gross income). The majority does not tell us what policy considerations inform its judgment as to the limits of the matching principle. Given the uncertainty as to Congress' policy considerations, I think that we must accord the Treasury much leeway in writing its regulations, and I would not hold section 1.267(a)–3(b) invalid.

## Standard of Review

The majority has well stated the standard for reviewing a regulation:

In determining the validity of section 1.267(a)–3, * * * our role is limited. We ordinarily defer to the regulation if it " '[implements] the congressional mandate in some reasonable manner.' " An interpretative regulation is a reasonable implementation of the congressional mandate if it "harmonizes with the plain language of the statute, its origin, and its purpose." * * *

Where the Commissioner acts under a specific grant of authority, our primary inquiry is whether the regulation is not manifestly contrary to the statute and is not arbitrary or capricious. [Majority op. p. 666; citations omitted.]

I would add only the following: The role of the judiciary in reviewing Treasury regulations begins and ends with assuring that the Commissioner's regulations fall within her authority to implement the congressional mandate in some reasonable manner. *United States v. Correll,* 389 U.S. 299, 307 (1967).

Given the application of section 267(a)(2) to a tax-exempt organization and its controlling persons, sec. 267(b)(9), I do not find the interest rule of section 1.267(a)–3(b) an unreasonable interpretation of the statute. That is particularly so given, as the majority acknowledges, majority op. pp. 669–670, the contemplation of just such a rule in the legislative history of section 267(a)(3). The flaw in the majority's reasoning is in its interpretation of the matching principle. Its technical analysis is insufficient to illuminate some principled distinction between the case of a tax-exempt organization and a treaty exemption. The boundaries of the matching principle are unclear because the policy behind the principle is unclear. Whatever those boundaries are, I am *not* convinced that they *in*clude a tax-exempt organization and *ex*clude a treaty exemption. To me, it is reasonable to treat such cases alike. I cannot find the regulation invalid for the reasons stated by the majority.

*Retroactivity*

The majority finds

the retroactive application of section 1.267(a)–3, Income Tax Regs., to petitioner to be unduly harsh and oppressive. Accordingly, we hold that the regulation, as applied to petitioner, violates the Due Process Clause. * * .* [Majority op. p. 679.]

The majority's application of a promptness requirement, as a matter of due process, to the regulations process is novel, and raises many interesting issues: e.g., what principled distinction can be drawn between interpretative regulations and administrative regulations? It suffices, however, for me to say that I do not agree that the application of section 1.267(a)–3(b) to petitioner is "so harsh and oppressive as to transgress the constitutional limitation" of due process. *United States v. Carlton,* 512 U.S.____, ____, 114 S. Ct. 2018, 2022 (1994) (quoting *Welch v. Henry,* 305 U.S. 134, 147 (1938)). Simply put, petitioner was on notice of what position the regulations might take with regard to interest, and, for that reason, it is difficult for me to accord much weight to any reliance petitioner might have placed on the failure of the Treasury to state its position. The majority does not say why delay, per se, can give rise to a harsh and oppressive result, but I assume that the gravamen of its complaint is

the taxpayer's reliance on a contrary assumption. The majority acknowledges that the legislative history of section 267(a)(3) contemplates that the regulations to be issued might take just that position with regard to interest taken in section 1.267(a)–3(b). Majority op. p. 670. That being the case, and no contrary regulations having been issued in the interim, I fail to see that petitioner has a claim that rises to the level of a constitutional violation of due process. I would not hold the regulation invalid on that ground.

HAMBLEN and PARR, *JJ.*, agree with this dissent.

---

BEGHE, *J.*, dissenting: I respectfully dissent; we should uphold the regulation as a reasonable implementation of the matching principle in this case. In addition, we haven't received enough information or argument to tell whether retroactive application of the regulation to this case would be unconstitutional.

## I.

As the majority opinion points out, we must determine whether section 1.267(a)–3, Income Tax Regs., is a valid exercise of the broad authority granted to the Secretary by section 267(a)(3). Majority op. p. 666. If Congress has authorized the Secretary to fill a gap in the statute, we give controlling weight to the Secretary's regulations, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982); *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981), unless they are arbitrary, capricious or manifestly contrary to the congressional mandate, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., supra* at 843–844; *United States v. Vogel Fertilizer Co., supra* at 24; *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 488 (1979).

What may be the Secretary's less-than-perfect (or even second-best) implementation of the statutory mandate is. sufficiently reasonable to prevent the regulation from being "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., supra* at 844; *National Muffler Dealers Association, Inc.*

*v. United States, supra* at 488 ("The choice among reasonable interpretations is for the Commissioner, not the courts."). I don't believe the regulation is so obviously contrary to the statutory mandate as to be invalid when three other Judges and their adherents (all presumably having the faculty of reason) conclude that section 267(a)(3) expands the scope and reach of the matching principle of section 267 (Swift, J., dissenting op. p. 680), that the regulation implements the statute in reasonable fashion (Halpern, J., dissenting op. p. 695), and that the regulation is entirely consistent with the statutory mandate (Gerber, J., dissenting op. p. 688).

I would uphold the regulation by reading together the statute's invocation of the matching principle and Article 24(3) of the U.S.-U.K. Income Tax Treaty[1] as integrated parts of an overall scheme to prevent double taxation. Both the full title of the treaty and its preamble make clear that preventing double taxation is one of the treaty's primary purposes. The treaty and our domestic law should be interpreted so as to accomplish that purpose. *Maximov v. United States,* 373 U.S. 49 (1963) (purposes of U.S.-U.K. Income Tax Treaty stated in preamble do not suggest treating trust as separate taxable entity); *United States v. Vetco Inc.,* 644 F.2d 1324 (9th Cir. 1981) (one of purposes of U.S.-Swiss Income Tax Treaty— prevention of fraud—would be ill-served by limiting means of acquiring information to those named in treaty). It is well-settled law that, when possible, statutes should be read so as to be consistent with our treaty obligations. *Weinberger v. Rossi,* 456 U.S. 25, 33 (1982); *Clark v. Allen,* 331 U.S. 503, 508–511 (1947); *Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804); *United States v. Palestine Liberation Org.,* 695 F. Supp. 1456, 1465 (S.D.N.Y. 1988).

The versions of sections 894(a) and 7852(d) in effect before their amendment in 1988 already suggested that we should consider tax treaties when interpreting tax statutes. The lan-

---

[1] The first sentence of par. (3) of Art. 24, Nondiscrimination, reads as follows:

(3) Subject to the provisions of paragraph (4) of this Article, interest, royalties and other disbursements paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, if reasonable in amount, be deductible for the purpose of determining the taxable profits of such enterprise under the same conditions as if they had been paid to a resident of the first-mentioned State. * * *

Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, Dec. 31, 1975, U.S.-U.K., Art. 24(3), 31 U.S.T. 5668, 5687.

guage of the new version of section 894(a) supports the need to do so even more strongly: "The provisions of this title shall be applied to any taxpayer *with due regard to any treaty obligation of the United States* which applies to such taxpayer." (Emphasis added.) If the majority opinion correctly asserts (p. 664 note 8) that the changes in sections 894 and 7852(d) were made only for the purpose of clarifying the interaction between statutes and treaties,[2] then the new texts imply that the 100th Congress believed that the old versions of the two sections already meant that "due regard" was to be paid to tax treaties in the application of the Internal Revenue Code. However, regardless of whether the majority are correct on this point, the Internal Revenue Code and the treaty should be interpreted harmoniously.

Article 24(3) of the treaty, 31 U.S.T. at 5687, as of the time the treaty was adopted, displays the assumption that the "other Contracting State"—here the United Kingdom—would tax the recipient of U.S.-source income when the recipient received the payment. Indeed, during the years in question, the United Kingdom did tax the payments in question on a cash basis. In these circumstances, I believe that the regulation reasonably implemented the matching principle by delaying the deduction of interest expense for U.S. income tax purposes until petitioner's U.K. parent recognized the interest income in issue for U.K. income tax purposes.[3]

II.

If the retroactive application of a regulation is unconstitutional, there has been an abuse of discretion. *Pacific First Fed. Sav. Bank v. Commissioner,* 101 T.C. 117, 121 (1993). A taxpayer attempting to demonstrate an abuse of discretion, in the area of retroactivity as elsewhere, carries a heavy bur-

---

[2] The majority assert, majority op. p. 664 note 8, citing the legislative history of the 1988 changes and IRS Pub. 515, that income exempt by treaty from U.S. income taxation continues to be excluded from gross income. Because, however, there is evidence strongly suggesting that such income should be included in gross income under the 1988 amendments, H. Conf. Rept. 100–1104, at 5, 12 (1988), 1988–3 C.B. 473, 495, 502, and because those amendments do not apply to the tax years in this case, we should reserve for a later decision the question of what effect those amendments have on treaty-exempt income accrued or paid in later years.

[3] The majority opinion indicates, majority op. p. 658, that, in 1993, the income tax laws of the United Kingdom were changed to provide that interest income received from foreign sources would be subject to tax when the interest accrues rather than when it is received. However, now is not the time to consider what our view of the regulation should be if petitioner's U.K. parent were taxed on such interest payments on an accrual basis.

den of proof and persuasion. *Id.* The parties did not raise the constitutional question at trial or on brief, and respondent has not had the opportunity to bring to our attention the considerations that may support the retroactive application of the regulation. It would therefore amount to an arrogation of power by this Court to hold the regulation invalid on constitutional grounds without putting petitioner to its proof and without the benefit of respondent's views on the matter.

GERBER, *J.,* agrees with this dissent.