MORGAN PACIFIC CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morgan Pac. Corp. v. Commissioner
Docket No. 2653-93.
United States Tax Court
T.C. Memo 1995-418; 1995 Tax Ct. Memo LEXIS 425; 70 T.C.M. (CCH) 540; August 28, 1995, Filed *425 Decision will be entered under Rule 155. Lawrence L. Hoenig, Keith R. Gercken, and Gary H. Anderson, for petitioner. Kevin G. Croke, Cynthia J. Mattson, and Grace L. Perez-Navarro, for respondent. RUWE, Judge RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined a deficiency of $ 136,500 in petitioner's Federal income tax for the year ended December 31, 1986, [1] and additions to tax as follows: Additions to Tax
Sec. 6651
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6656
$ 35,976.04
$ 7,201.45
50 percent of
$ 14,402.90
the interest due
on $ 136,500
The issues *426 for decision are: (1) Whether certain transactions recorded in the accounts of petitioner and its ostensible creditor at a foreign banking corporation constitute a "payment" of $ 455,000 within the meaning of section 1442, [2] and if so, (2) whether petitioner was required to withhold $ 136,500 pursuant to section 1442, because the $ 455,000 payment was an interest payment as opposed to a nontaxable distribution with respect to its equity. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner is an Oregon corporation, which was formed in October 1980. At the time the petition was filed, petitioner's *427 principal office was located in Larkspur, California. Throughout 1986, petitioner's office was located at 601 Montgomery Street, Suite 702, San Francisco, California. Background
During 1986, petitioner was a holding company having subsidiaries and affiliates primarily engaged in real estate investment and management businesses. Morgan Pacific Realty Corp. (Morgan Pacific Realty), a California corporation, which was wholly owned by petitioner, engaged in real estate investment in California and Arizona. Throughout 1986, petitioner's officers were Colin Clout, president; Joske M. Thompson, vice president; A. Vikram Shah, executive vice president and comptroller; and Charlotte Sullivan, vice president and office manager. From January 1, 1986, through September 30, 1986, petitioner's stock was held as follows: Jays Holding, Ltd. (Jays Holding), a Jersey, Channel Islands corporation, owned 53.64 percent; Portman Securities, Ltd. (Portman), a Jersey, Channel Islands corporation, owned 25.16 percent; and Regent Trust Co. (Regent), a British Virgin Islands trust company, owned 21.2 percent. For the remainder of 1986, petitioner's stock was held as follows: Jays Holding owned 64.51 *428 percent; Portman owned 19.26 percent; and Regent owned 16.23 percent. The change in stock ownership resulted from a purchase of stock in 1986 by Jays Holding in the amount of $ 833,000. Mr. David Thorpe was the ultimate owner of Jays Holding. Regent held its interests in petitioner in its capacity as trustee of the Yorkshire Trust. Mr. Thorpe was the ultimate beneficiary of the Yorkshire Trust. Portman was owned by the Tancred family of Queensland, Australia. The Tancreds were the largest beef exporters in Australia. Continental and American Banking Corp.
Mr. Thorpe advised the Tancreds on how to invest their money outside of Australia. Petitioner, Morgan Pacific Realty, and Continental & American Banking Corp. (CABC), a Nauru banking corporation whose principal offices were in Monte Carlo, Monaco, were the vehicles by which Mr. Thorpe invested the Tancreds' money in U.S. real estate operations. Mr. Thorpe controlled CABC. Mr. Thorpe and his clients utilized CABC, in part, for the purpose of entering into "acceptance" transactions. An "acceptance" transaction was a means by which Mr. Thorpe and his clients could repatriate "offshore" earnings free from Australian income *429 tax. In short, "offshore" earnings were deposited into an account at CABC, and, in turn, CABC would "loan" the money back to Mr. Thorpe and his clients, or, alternatively, would reroute the money for continued investment outside Australia. Because the earnings were either rerouted or returned as "loans", no Australian tax was paid. These transactions were evidenced by banking notes and were approved by the Reserve Bank of Australia. Morgan Pacific Acceptance Corp., which was owned by Mr. Thorpe, arranged the "acceptance" transactions for a fee. The "acceptance" transactions were transmitted from CABC's bank accounts to Mr. Thorpe's Australian clients. CABC had bank accounts at First Interstate Bank in New York, San Francisco, and London. CABC's First Interstate account in New York was its main account. CABC also had accounts with Westpac Banking Corp. in Chicago. Petitioner and Portman each had accounts at CABC. Petitioner's primary bank account was maintained at the San Francisco branch of First Interstate Bank. Petitioner also maintained certain bank accounts with the Chicago branch of Westpac Banking Corp. Petitioner's subsidiaries also maintained various bank accounts with First *430 Interstate Bank. Mid-Coast
In April 1984, Jays Holding purchased all the stock of Hofplein Investments N.V. for 7,500 Dutch Guilders, which was approximately $ 2,500 in U.S. currency. In September 1984, Jays Holding changed Hofplein Investments N.V.'s name to Mid-Coast Finance N.V. Mid-Coast Finance N.V. (Mid-Coast) was a Netherlands Antilles corporation. Mid-Coast had accounts with CABC, First Interstate, and Westpac Banking Corp.
Mid-Coast's accounting entries for September of 1984, show that on the same day Jays Holding contributed $ 1,000,000 in capital to Mid-Coast, the $ 1,000,000 was loaned interest free back to Jays Holding. No other money was contributed to Mid-Coast. As required by Antillean law, Mid-Coast maintained a registered office in Curacao. The address used by Mid-Coast on its 1985, 1986, and 1987 Form 1120F (U.S. Income Tax Return of a Foreign Corporation) was 601 Montgomery Street, Suite 702, San Francisco, California. Petitioner's office was located at this same San Francisco address. Mid-Coast was never a party to a lease at the San Francisco address. Mr. Joske M. Thompson and Ms. Charlotte Sullivan were directors of Mid-Coast. These were unpaid positions. *431 Mr. Thompson and Ms. Sullivan were also officers of petitioner. Mr. Thompson and Ms. Sullivan operated out of the office at the San Francisco address. Mid-Coast never employed any persons in the United States. Mid-Coast was never listed in a U.S. telephone directory and has never advertised its services in the United States. Mid-Coast filed a Statement and Designation by Foreign Corporation and was qualified to do business in California on October 18, 1984. Mid-Coast received a Commercial Finance Lender License from the California Department of Corporations on September 9, 1985. On its 1985, 1986, and 1987 Forms 1120F, Mid-Coast marked "Yes" to the question: "Were you at any time during the tax year engaged in a trade or business in the U.S.?" Petitioner concedes that Mid-Coast did not engage in a trade or business within the United States during the 1986 calendar year. 1986 Debt Restructuring
From May 1984 through September 1985, Morgan Pacific Realty borrowed $ 4,550,000 from Portman. The loans were evidenced by various discount promissory notes with maturity dates not more than 180 days. [4]
*432 As of September 21, 1985, Morgan Pacific Realty had outstanding debt in the total amount of $ 4,937,947, as evidenced by the discount promissory notes issued to Portman. The difference of $ 387,947 between the original loans totaling $ 4,550,000 and the amount of $ 4,937,947 owing as of September 21, 1985, was deducted by petitioner as original issue discount. [5]
On March 11, 1986, petitioner, Morgan Pacific Realty, Portman, and Mid-Coast, entered into and made effective as of September 30, 1985, the following simultaneous transactions: (1) Mid-Coast purchased the original Morgan Pacific Realty promissory notes from Portman in exchange for a $ 4,550,000 note (Mid-Coast-Portman Note). (2) Morgan Pacific Realty issued a $ 4,937,947 demand *433 note (Morgan Pacific Realty Demand Note) to Mid-Coast in exchange for the original Morgan Pacific Realty promissory notes. (3) Petitioner issued a $ 4,550,000 "Mandatory (Subordinated) Convertible Note" to Mid-Coast (Petitioner-Mid-Coast Note) in exchange for the $ 4,937,947 Morgan Pacific Realty Demand Note.
As a result of the conversion of the $ 4,937,947 promissory notes into a single $ 4,550,000 note (the Petitioner-Mid-Coast Note), petitioner reported forgiveness of indebtedness income in the amount of $ 387,947 on its Form 1120 (U.S. Corporation Income Tax Return) for the taxable year ending September 30, 1985. The Petitioner-Mid-Coast Note provided for a due date of September 15, 1996, and called for interest at 10.5 percent, with the first installment of interest of $ 477,750 due September 30, 1986. The Petitioner-Mid-Coast Note required payment of the principal to be in stock of petitioner. [6] On September 30, 1986, petitioner's CABC account was debited $ 455,000, and Mid-Coast's CABC account was credited $ 455,000 in satisfaction of a portion of petitioner's interest obligation to Mid-Coast. Thus, while petitioner's interest obligation to Mid-Coast was $ 477,750, *434 only $ 455,000 was debited and credited to petitioner's and Mid-Coast's CABC accounts. Petitioner never paid the remaining $ 22,750 of interest to Mid-Coast. The Mid-Coast-Portman Note *435 was due September 30, 1994, and called for interest at 10 percent, with the first installment of interest of $ 455,000 due September 30, 1986. The Mid-Coast-Portman Note provided that the payment of principal be in "such coin or currency of the United States". On September 30, 1986, Portman's CABC account was credited $ 455,000, and Mid-Coast's CABC account was debited $ 455,000 in satisfaction of Mid-Coast's obligation to Portman. Prior to this, on September 1, 1986, Portman purchased additional Class A preferred stock of petitioner for $ 400,000. Portman paid for the stock by debiting its CABC account $ 400,000 and by crediting petitioner's CABC account $ 400,000. Petitioner reported the $ 4,550,000 Petitioner-Mid-Coast Note as "Other liabilities" on the balance sheet of its Forms 1120 for the fiscal years ended September 30, 1985, and 1986. Petitioner reported the $ 4,550,000 Petitioner-Mid-Coast Note as "Mandatory Convertible Notes" just below "Total Liabilities Before Mandatory Convertible Notes" on its consolidated financial statements for the years ended September 30, 1985, and 1986. Petitioner claimed a $ 455,000 interest deduction arising from its obligation to Mid-Coast *436 on its Form 1120 for the fiscal year ended September 30, 1986. Petitioner's books and records reflect payment of the $ 455,000 interest obligation to Mid-Coast. However, the $ 455,000 represented an interest payment of only 10 percent, not 10.5 percent as required under the terms of the loan. Mid-Coast reported the Petitioner-Mid-Coast Note as "Other assets" on the balance sheet of its Forms 1120F for the tax years ending December 31, 1985, and 1986. In an attached statement to its returns, Mid-Coast referred to the Petitioner-Mid-Coast Note as "Notes Receivable-Long Term". Also on its returns, Mid-Coast reported the Mid-Coast-Portman Note as a long-term note payable. Mid-Coast treated the $ 4,550,000 Mid-Coast-Portman Note as debt on its books and records. On its 1986 Form 1120F, Mid-Coast reported the $ 455,000 payment from petitioner as interest income and the $ 455,000 payment to Portman as an interest deduction. Mid-Coast's books and records reflect receipt of $ 455,000 from petitioner and payment of $ 455,000 to Portman. On its books and records, Mid-Coast accrued the remaining $ 22,750 interest that petitioner owed. Collateral Agreement
At or about the time of the *437 March 11, 1986, debt-restructuring transactions, Portman, Jays Holding, and Regent (the three corporations that held 100 percent of petitioner's stock) entered into a "Collateral Agreement". Even though the agreement was not executed until on or about March 11, 1986, the agreement purports to have been "made as of September 30, 1985". The purpose of the agreement was to ensure that the value of the interest payable to Portman with respect to the Mid-Coast-Portman Note would be received by Jays Holding and Regent, and that Portman would receive a 100-percent equity return in petitioner. One of the recitals in the agreement provided that: it is the mutual interest of the parties hereto that Portman shall, during the five-year period commencing September 30, 1985, continue to participate (on a 100% rather than 25.16% basis) in the financial returns resulting from the continued holding by * * * [Morgan Pacific Realty], or the disposition by * * * [Morgan Pacific Realty] of the * * * [United States Real Property Interests];
Essentially, therefore, Portman swapped the interest it was to receive on the Mid-Coast-Portman Note for the equity interests of Jays Holding and Regent *438 in petitioner. Petitioner was not a party to the agreement, and while the agreement refers to both the Petitioner-Mid-Coast Note and the Mid-Coast-Portman Note, neither of these two notes refers to the agreement. Petitioner had no current or accumulated earnings and profits during 1986. OPINION Section 881(a)(1) imposes "for each taxable year a tax of 30 percent of the amount received from sources within the United States by a foreign corporation as * * * interest * * * but only to the extent the amount so received is not effectively connected with the conduct of a trade or business within the United States." [7]Section 1442(a) provides that in the case of foreign corporations subject to this 30-percent tax, "there shall be deducted and withheld at the source in the same manner and on the same items of income as is provided in section 1441 a tax equal to 30 percent thereof." *439 Section 1441(a) and (b) requires all persons having the control, receipt, custody, disposal, or payment of certain types of income, including interest (to the extent that any of such items constitutes gross income from sources within the United States), to deduct and withhold from such items a tax equal to 30 percent thereof. Section 1.1441-1, Income Tax Regs., provides that withholding of the 30-percent tax is required "when such income is paid to a * * * foreign corporation". Section 1461 makes the payor personally liable for this withholding tax. The income and tax referred to in these sections are required to be reported annually on Form 1042 (Annual Withholding Tax Return for U.S. Source Income of Foreign Persons). [8]
*440 Section 894 provides that "to the extent required by any treaty obligation of the United States," income of any kind shall be exempt from taxation and shall not be included in gross income. See Tate & Lyle, Inc. & Subs. v. Commissioner, 103 T.C. 656, 664 (1994). During the year at issue, article VIII of the income tax treaty between the United States and the Netherlands, as extended to the Netherlands Antilles (Treaty), provided the following: (1) Interest on bonds, notes, debentures, securities, deposits or any other form of indebtedness * * * paid to a resident or corporation of one of the Contracting States shall be exempt from tax by the other Contracting State. (2) Paragraph (1) of this Article shall not apply if the recipient of the interest has a permanent establishment in the other Contracting State and the indebtedness giving rise to the interest is effectively connected with the permanent establishment. * * * [Convention with Respect to Taxes, Apr. 29, 1948, U.S.--Neth., art. VIII, 62 Stat. 1757, 1761, supplemented by Protocol, Oct. 23, 1963, 15 U.S.T. 1900, modified by Supplementary Convention, Dec. 30, 1965, 17 U.S.T. 1896, 1901.]
*441 Respondent determined that petitioner was required to withhold $ 136,500 of the interest payments of $ 455,000 pursuant to section 1442. Relying on our opinion in Aiken Indus., Inc. v. Commissioner, 56 T.C. 925 (1971), respondent contends that the interest payments made to Mid-Coast were not "paid to" a Netherlands Antilles corporation within the meaning of the Treaty, but were in substance paid to Portman and, therefore, were not exempt from taxation pursuant to section 894. In other words, respondent contends that Mid-Coast should be considered a conduit or disregarded with respect to the $ 455,000 payment. On brief, petitioner concedes that under Aiken Indus., Inc., the $ 455,000 payment to Mid-Coast was in substance paid to Portman and, therefore, was not exempt from tax under section 894. Nevertheless, petitioner contends that it was not required to withhold the $ 136,500, because (1) no "payment" was made to which section 1442 applies, or (2) the payment was a nontaxable distribution with respect to its equity. Respondent's determinations are presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). *442 "Payment" Under Section 1442
Petitioner contends that there was no "payment" to which section 1442 applies because the debits and credits of $ 455,000 made to petitioner's, Mid-Coast's, and Portman's CABC accounts were merely book entries rather than actual payments of cash. Respondent argues that the debits and credits made to petitioner's, Mid-Coast's, and Portman's CABC accounts constituted "payments" within the meaning of section 1442. We agree with respondent. Petitioner's contention that the debits and credits to the CABC accounts were merely book entries ignores the fact that CABC was a Nauru banking corporation. Although there is nothing in the record explaining what rules and procedures Nauru banking corporations must follow, based on the record before us, we are not willing to find that CABC had no obligation to pay deposits to its depositors. [9] Moreover, petitioner stipulated that the debit and credit adjustments of $ 455,000 to the CABC accounts discharged petitioner's interest obligation to Mid-Coast, and Mid-Coast's interest obligation to Portman: On September 30, 1986, petitioner's account at CABC was debited $ 455,000 and Mid-Coast['s] * * * account at *443 CABC was credited $ 455,000 in recognition of petitioner's satisfaction of its interest obligation to Mid-Coast * * * Also on September 30, 1986, Mid-Coast['s] * * * account at CABC was debited $ 455,000 and Portman['s] * * * account at CABC was credited $ 455,000 in recognition of Mid-Coast Finance's satisfaction of its interest obligation to Portman * * *
*444 Additionally, the manner in which Mid-Coast and petitioner recorded the $ 455,000 payment in their books and records also evidences that these transactions represented more than mere bookkeeping entries. For example, petitioner stipulated that Mid-Coast's books and records reflect receipt of the $ 455,000 payment from petitioner. With respect to the remaining .5 percent of interest that petitioner owed, petitioner stipulated that it was accrued by Mid-Coast. From this, we conclude that Mid-Coast must have credited $ 22,750 to an interest income account and debited $ 22,750 to an interest receivable account. Such an accounting entry would reflect the accrual of the .5 percent of interest petitioner still owed Mid-Coast. To record the payment of $ 455,000, Mid-Coast would have credited an interest income account with $ 455,000 and debited a cash account (the CABC account) with $ 455,000. Petitioner also stipulated that its "books and records reflect payment of the $ 455,000 interest obligation to Mid-Coast". While Mid-Coast accrued the $ 22,750 that petitioner still owed, there is no evidence that petitioner made a similar accrual. From these facts, we conclude that petitioner must *445 have recorded the $ 455,000 as an actual payment of interest and not as an accrual of interest. Therefore, Mid-Coast and petitioner apparently considered the debits and credits to the CABC accounts to be the actual receipt and payment of cash. Had this not been the case, Mid-Coast would have accrued the entire $ 477,750 as interest receivable--not just the $ 22,750--and petitioner would have accrued its payment as interest payable. Petitioner contends that it never transferred anything of value to either Mid-Coast or Portman during 1986. This is controverted by the stipulation that Portman purchased additional Class A preferred stock of petitioner by debiting $ 400,000 to Portman's CABC account and crediting $ 400,000 to petitioner's CABC account. [10] Thus, the $ 400,000 stock purchase evidences that debits to petitioner's, Mid-Coast's, and Portman's CABC accounts resulted in a real economic detriment, and that credits to these accounts represented income. Therefore, something of value was transferred when the CABC accounts were credited. *446 Petitioner further argues that the interest obligations could not have been satisfied because there was insufficient cash in petitioner's, Mid-Coast's, and CABC's banking accounts on September 30, 1986. With regard to petitioner's cash position, petitioner points out: (1) that its First Interstate Bank account ranged between a high of $ 40,054.31 on September 10, 1986, and a low of $ 2,141.51 on September 30, 1986, (2) that its accounts at Westpac Banking Corp. were used almost exclusively for holding client funds, and (3) that its subsidiaries' bank accounts with First Interstate Bank "did not have significant balances". With respect to petitioner's cash position, petitioner reported on its Form 1120 for the fiscal year ending September 30, 1986, that it had cash of $ 742,678 at the end of its taxable year. Similarly, petitioner's consolidated financial statements reflected cash-on-hand of $ 742,678, as of September 30, 1986. Just prior to the $ 455,000 debit to petitioner's CABC account on September 30, 1986, there was a positive balance of $ 468,743. Therefore, even if we assume, as petitioner appears to contend, that petitioner's ability to satisfy its obligations must be determined *447 solely by reference to the amount of cash it had available on September 30, 1986, we are not convinced that petitioner did not have sufficient cash to meet its obligations. With respect to Mid-Coast's cash position, petitioner argues that "Mid-Coast had no funds" as of September 30, 1986. The parties agree that Mid-Coast did not maintain a significant amount of money in its First Interstate accounts and that it maintained a zero balance in its Westpac Banking Corp. account for the months of August, September, and October 1986. However, on its 1986 Form 1120F, Mid-Coast reported cash of $ 201,031 as of December 31, 1986. Notwithstanding the amount of cash Mid-Coast had available on September 30, 1986, because Mid-Coast was to receive $ 477,750 from petitioner, and pay $ 455,000 to Portman, an insignificant balance in Mid-Coast's CABC account, or any other account for that matter, would not have impacted its ability to satisfy its obligations. Indeed, just prior to the simultaneous credit and debit of $ 455,000, Mid-Coast's CABC account had a positive balance of $ 192,255. Just after the simultaneous credit and debit of $ 455,000, Mid-Coast's CABC account had a positive balance of *448 $ 192,255, the same amount it started with. Finally, petitioner argues that "CABC would not have been able to satisfy any of the deposit accounts created as a result of the September 1986 book entries." In support of this, petitioner relies on the balance in CABC's account at First Interstate in San Francisco for the months of August and November 1986. However, this ignores: (1) that CABC had bank accounts at First Interstate Bank in New York, San Francisco, and London, (2) that CABC's main account was at First Interstate in New York, and (3) that CABC also had accounts with Westpac Banking Corp. in Chicago. Therefore, we are not convinced that the balance in CABC's account at the San Francisco branch of First Interstate is reflective of its ability to satisfy its deposit accounts. [11] Based on the foregoing, we find that the $ 455,000 debit to petitioner's CABC account constituted "payment" within the meaning of section 1442. *449 Nontaxable Distribution With Respect to Equity
We now turn to petitioner's argument that Portman in substance held an equity interest in petitioner and that the $ 455,000 payment was a nontaxable distribution. [12] Petitioner recognizes that the form of the transaction was debt. [13] Nevertheless, petitioner contends that because respondent has elected to recharacterize a portion of "an integrated transaction" under the substance-over-form doctrine--i.e., disregarding Mid-Coast for purposes of the $ 455,000 payment--the substance-over-form doctrine should be applied consistently to the entire transaction. *450 Even assuming petitioner is correct, petitioner has not shown that the $ 455,000 payment was in substance made with respect to equity. Rule 142(a). In Bauer v. Commissioner, 748 F.2d 1365, 1367 (9th Cir. 1984) (quoting Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970)), revg. T.C. Memo. 1983-120, the Court of Appeals for the Ninth Circuit stated that the "question *451 of whether an advance to a corporation is debt or equity is 'primarily directed at ascertaining the intent of the parties'." The Court of Appeals for the Ninth Circuit has identified eleven factors that are considered when making this determination: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions. [Bauer v. Commissioner, supra at 1368 (quoting Lantz Co. v. United States, supra).]
Petitioner made no serious attempt to apply the above factors to the facts before us. Instead, petitioner contends that the collateral agreement that was entered into between Portman, Jays Holding, *452 and Regent, when examined in combination with the Petitioner-Mid-Coast Note and the Mid-Coast-Portman Note, "demonstrates that Portman's real economic return depended solely upon the performance of the underlying Morgan Pacific Realty real estate assets." In effect, Portman, Jays Holding, and Regent (the three corporations that held 100 percent of petitioner's stock) agreed to swap a return on debt for a return on equity. This was to provide Portman with a 100-percent equity return, rather than the 25.16-percent return Portman would otherwise receive by virtue of its ownership interest in petitioner. Petitioner, however, was not a party to the collateral agreement, and while the collateral agreement refers to both the Petitioner-Mid-Coast Note and the Mid-Coast-Portman Note, neither of these notes refers to the agreement. The fact that petitioner's shareholders agreed to swap a return on debt in exchange for a return on equity does not change the debtor-creditor relationships between petitioner, Mid-Coast, and Portman. We find that while the collateral agreement evidences an intent by petitioner's shareholders to alter the return on their investment in petitioner, the obligations *453 between petitioner, Mid-Coast, and Portman were not intended to be, and were not in fact, affected by the collateral agreement. Petitioner also argues that even apart from the collateral agreement, based on Notice 94-47, 1994-1 C.B. 357, petitioner's distribution must be characterized as made with respect to equity and not debt. Notice 94-47, supra, provides that the Internal Revenue Service will scrutinize instruments that are "designed to be treated as debt for federal income tax purposes but as equity for regulatory, rating agency, or financial accounting purposes. These instruments typically contain a combination of debt and equity characteristics." Notice 94-47, supra, also provides (1) that the "Service is aware of recent offerings in which taxpayers may be relying on Rev. Rul. 85-119, 1985-2 C.B. 60", and (2) that the "holding in Rev. Rul. 85-119 is limited to the facts of that ruling." On brief, petitioner states that at the time of restructuring its debt in 1986: "Petitioner relied on Revenue Ruling 85-119, 1985-2 C.B. 60 *454 in determining that the * * * [Petitioner-Mid-Coast Note] should be treated as debt for U.S. federal income tax purposes." Like the instruments analyzed in Rev. Rul. 85-119, 1985-2 C.B. 60, the Petitioner-Mid-Coast Note was to be exchanged at maturity for stock "with a Market Value equal to the principal amount" of the note. Rev. Rul. 85-119, supra, provides that this is a factor weighing in favor of a determination that the instrument is debt: Finally, because the number of shares of stock to be issued at maturity in exchange for Notes is not fixed but is based on the face amount of Notes, Noteholders, during the term of the Notes, do not share in the increase or decrease in the market value of such * * * stock. * * * [ Rev. Rul. 85-119, 1985-2 C.B. 60, 61.]
The only significant difference between the Petitioner-Mid-Coast Note and the instruments analyzed in Rev. Rul. 85-119, supra, is that the noteholders in Rev. Rul. 85-119 essentially had an option to *455 receive cash or stock at maturity. In Rev. Rul. 85-119, supra, the noteholders could choose to be repaid in cash or in stock. If the noteholders opted for payment in cash, the obligor was required to effect a secondary offering of stock and deliver at maturity, cash equal to the principal amount of the notes. Unlike the notes in Rev. Rul. 85-119, supra, the Petitioner-Mid-Coast Note provided that the obligation to exchange stock for the note was "absolute and unconditional." With respect to the requirement that principal be paid solely in stock, Notice 94-47 provides: Instruments that are similar to the [ Rev. Rul. 85-119] Notes but that, on balance, are more equity-like are unlikely to qualify as debt for federal income tax purposes. For example, an instrument does not qualify as debt if it has terms substantially identical to the [ Rev. Rul. 85-119] Notes except for a provision that requires the holder to accept payment of principal solely in stock of the issuer (or, in certain circumstances, a related *456 party). * * * [1994-1 C.B. 357.]
Based on Notice 94-47, petitioner argues: Given the foregoing, and given the uncontroverted terms of the * * * [Petitioner-Mid-Coast Note] and the understanding of the parties that on maturity the * * * [Petitioner-Mid-Coast Note] was to be satisfied in stock, the * * * [Petitioner-Mid-Coast Note] should be considered an equity, and not a debt, interest in petitioner under the standards recently announced by respondent even without regard to the provisions of the Collateral Agreement. * * *
On brief, respondent states that if we determine that the Petitioner-Mid-Coast Note "alone reflects the scope of petitioner's obligations for purposes of determining the character of the payment made to Portman via the Mid-Coast conduit, then respondent acknowledges that, if viewed, in isolation, the terms of the Petitioner-Mid-Coast note create an equity interest under the Notice". Respondent argues that because petitioner agrees that Mid-Coast was a conduit with respect to payment of the notes, we should not ignore the terms of the Mid-Coast-Portman Note, which provided for payment of principal in "such coin or currency *457 of the United States", in determining the substance of the obligations between petitioner and Portman. Respondent also points out that petitioner never fully respected the terms of the Petitioner-Mid-Coast Note. For example, petitioner paid only $ 455,000 of interest on September 30, 1986, when petitioner was obligated to pay $ 477,750. Moreover, it appears that petitioner never intended to pay the remaining $ 22,750 of interest to Mid-Coast. While Mid-Coast accrued the $ 22,750, there is no evidence of petitioner making a similar accrual. In fact, petitioner never paid the $ 22,750 to Mid-Coast. Based on petitioner's failure to comply with the terms of the Petitioner-Mid-Coast Note, combined with Portman's right to receive cash, respondent concludes that in substance there was an obligation to pay and a right to receive cash at maturity. On this basis, respondent distinguishes Notice 94-47. Petitioner essentially relies solely on its obligation to pay Mid-Coast in stock and ignores Portman's right to receive cash. In light of the parties' agreement that Mid-Coast was a conduit with respect to the $ 455,000 payment, and Portman's right to receive cash in payment of the principal under *458 the Mid-Coast-Portman Note, combined with the fact that petitioner did not respect the interest payment terms of the Petitioner-Mid-Coast Note, we are inclined to agree with respondent. Petitioner has not convinced us that respondent's determination is erroneous. Accordingly, we sustain respondent's determination. Decision will be entered under Rule 155. Footnotes
1. The deficiency of $ 136,500 was based on respondent's determination that petitioner failed to withhold taxes on payments of $ 455,000 made during 1986 pursuant to sec. 1442. Withholding taxes are computed on a calendar year basis. Sec. 1.1461-2(b), Income Tax Regs.↩ Accordingly, respondent determined a deficiency for year ended Dec. 31, 1986. Petitioner otherwise computes its Federal income tax on a fiscal year basis ending September 30.
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. If we hold that petitioner was required to withhold, petitioner concedes the additions to tax.↩
4. Morgan Pacific Realty issued the discount promissory notes to Portman; Jays Holding; Australian Beef Co., a Hong Kong corporation; CABC; and Brookside Partnerships No. 1, No. 2, and No. 3. The notes issued to the Brookside partnerships were assigned to Portman. The parties agree that Portman was the beneficial owner of all the notes issued by Morgan Pacific Realty. We will refer to the notes as being issued to Portman.↩
5. Even though the debt was owed by Morgan Pacific Realty, the parties stipulated that the original discount was deducted by petitioner. We assume the parties described the transaction in this manner because Morgan Pacific Realty was a member of petitioner's consolidated group.↩
6. The Petitioner-Mid-Coast Note provided the following: NOTES AND EXCHANGE UPON MATURITY↩. This Note is one of a duly authorized issue of * * * [petitioner's] Mandatory Subordinated Convertible Notes dated September 30, 1985, maturing on September 30, 1996 (the "Notes") being issued in the aggregate principal amount of $ 4,550,000. At maturity of the Notes, * * * [petitioner], at its option, shall exchange the outstanding Notes as a whole, for Capital Securities with a Market Value equal to the principal amount of the outstanding Notes, provided that holders will receive cash in lieu of fractional Capital Securities and for accrued and unpaid interest. * * * "Capital Securities" means any securities issued by * * * [petitioner] which consist of any one of the following: (i) Common Stock or (ii) Perpetual Preferred Stock. * * *
7. Mid-Coast did not engage in the conduct of a trade or business within the United States during the 1986 calendar year. Portman never engaged in the conduct of a trade or business within the United States.↩
8. Petitioner filed Form 1042 for 1986 on Jan. 25, 1988. The return was due to be filed by Mar. 15, 1987. Therefore, the return was not timely filed. Petitioner reported $ 75,289.09 of gross income subject to withholding, and $ 7,528.90 total tax liability on the return that was filed Jan. 25, 1988. The amounts reported on this return are unrelated to the $ 455,000 of interest at issue herein.↩
9. Mr. Richard M. Eigner, who specialized in international taxation at the law firm of Pillsbury, Madison & Sutro, was the principal lawyer in the United States for Mr. Thorpe and entities owned by Mr. Thorpe. Mr. Eigner had served for a time as a director and secretary of petitioner. On direct examination, Mr. Eigner testified that CABC functioned as a clearing house and not a bank, and that CABC was not in a position to pay deposits to its depositors, "except if those depositors had specified accounts with other financial institutions which were traceable and originated with those particular clients." Petitioner did not explain this qualification on CABC's ability to pay its depositors.↩
10. The parties stipulated that "Portman * * * purchased additional Class A preferred stock of petitioner with $ 400,000 of the $ 455,000 interest from Mid-Coast Finance thereby increasing its equity interest." Portman's and petitioner's CABC accounts were debited and credited $ 400,000, respectively, on Sept. 1, 1986. However, the $ 455,000 interest payment from Mid-Coast was not credited to Portman's CABC account until Sept. 30, 1986. These facts make the meaning of the stipulation ambiguous. Nevertheless, the $ 400,000 credit to petitioner's CABC account increased petitioner's positive balance from $ 73,743 to $ 473,743, giving petitioner sufficient cash to make the Sept. 30, 1986, interest payment of $ 455,000. Due to other debits and credits to petitioner's CABC account, just prior to petitioner's $ 455,000 interest payment, there was a positive balance in its CABC account of $ 468,743.↩
11. Petitioner also relies on the testimony of Mr. Colin Clout, petitioner's president, to support its contention that CABC did not have sufficient funds to satisfy its deposit accounts. But while Mr. Clout stated that to the best of his knowledge CABC would not have been able to satisfy its deposit accounts, he also stated that the "only person who would really know would be the controller".↩
12. Because petitioner had no current or accumulated earnings and profits, no part of any distribution deemed to have been made to Portman would have been a dividend. Sec. 301(c)(1). The parties agree that any amount of the distribution in excess of Portman's basis would have been considered non-U.S.-source capital gain, which is not subject to tax under sec. 882 or to withholding under sec. 1442↩. Secs. 301(c)(3), 865(a)(2).
13. On brief, petitioner states: Petitioner would be quite satisfied to be bound to the original form of its transaction. That form would produce no withholding tax liability on the basis that any interest payment deemed to have been made to Mid-Coast would be considered either (i) effectively connected with the conduct by Mid-Coast of a U.S. financing business (as originally reported), and hence not subject to withholding under Income Tax Regulations section 1.1441-4(a), or (ii)↩ exempt from withholding due to the application of Article VIII(1) of the United States-Netherlands Income Tax Treaty, as extended to the Netherlands Antilles.